THOMAS CRUM et al., Plaintiffs-Appellees, v. ANDREW KROL, Defendant-Appellant.

First District (5th Division)    No. 80-0187

Opinion filed August 14, 1981.

Barry Goodman, of Chicago, for appellant.

Elmore, Gowen & DeMichael, P. C., of Chicago, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

In this action for breach of a real estate contract, plaintiff was awarded damages under two counts of his complaint. Defendant appeals from the judgment, contending that: (1) the contract was never completed and is unenforceable under the Statute of Frauds; (2) the court should have directed a verdict in defendant's favor following the close of plaintiffs' case; (3) the court erred in adding Thomas Crum & Associates as a party plaintiff; (4) the damages award was erroneous and duplicative; and (5) defendant should have been awarded judgment on his counterclaim. For the reasons that follow, we affirm the trial court's judgment.

On October 11, 1975, defendant Andrew Krol engaged a real estate salesman, Lawrence Bergnach, to find a purchaser for a certain parcel of land. Krol signed the listing agreement as owner. Plaintiff, Thomas Crum, decided to buy it for use as a trucking terminal. Bergnach prepared two form documents titled "Real Estate Sales Contract," which listed Krol as the seller and Crum as the purchaser. Plaintiff's attorney, Elbert Elmore, used these documents to prepare the final written agreements. One document listed several contingencies to be performed.

The date on which Krol signed the documents was disputed at trial. Crum and Bergnach testified that he signed in March of 1976, but Krol contended that he did not sign them until late June or early July of 1976. Although Krol's brothers also owned part interest in the premises, their names were not included on the documents and they never signed them.

Crum testified that after the documents were signed, he, Krol, and Bergnach fulfilled the contingencies listed on the first document. Specifically, Krol signed a petition, which was ultimately granted, to rezone the property, thus permitting the future operation of Crum's trucking business. Crum obtained a soil test and paid for repairs of a well that furnished water to the property. He also secured financing. Bergnach obtained a permit from the State allowing for the development of sufficient ingress and egress from a main road to the real estate.

In May or June of 1976, Krol agreed to let Crum move onto the property to begin his trucking operations. He did not pay rent while he occupied the land. He testified that he incurred expenses in connection with establishing his business. Bills were introduced into evidence, over defense counsel's objection, which indicated that these expenses were paid by a corporation, Thomas Crum & Associates.[1]

In May, the final price terms were approved and initialled by the parties. In late June or early July of 1976, Crum and his attorney met with Bergnach and Krol, ostensibly to close the transaction. Title had been ordered down. During this meeting Krol took the contracts to be signed by his brothers and assured the others that there would be no problem in obtaining their signatures. The brothers never signed, however, and Crum did not receive title to the property.

Crum brought an action for damages against Krol, the other title-holders, Bergnach, and Wm. C. Groebe & Co. At the time of trial, however, Krol was the only remaining defendant. The trial court found Krol liable to Crum for breach of contract and awarded $13,435.65 in damages arising from the breach. The court further awarded Crum $3,746.55 pursuant to the unjust enrichment count of the complaint. Subsequently, Krol brought this appeal.

OPINION

I

The first and major issue is whether the parties entered into a valid, enforceable contract for the sale of the realty in issue. In essence, Krol argues that the two documents he signed do not satisfy the Statute of Frauds; further, that the documents must be construed as Crum's offer to purchase rather than a completed contract. The basis for both arguments is the failure of Krol's brothers, as co-owners of the realty, to sign the documents. We reject Krol's contentions.

A.

Section 2 of "An Act to revise the law in relation to frauds and perjuries" (Ill. Rev. Stat. 1977, ch. 59, par. 2) requires a contract for the sale of realty to "be in writing, and signed by the party to be charged therewith." Our courts have held that the writing must contain on its face or by reference to other writings the names of the buyer and seller, a description of the land, the price, terms, and conditions of sale, and the signature of the party against whom the contract is to be enforced. *Thompson v. Wiegand* (1956), 9 Ill. 2d 63, 136 N.E.2d 781; *Mid-Town Petroleum, Inc. v. Dine* (1979), 72 Ill. App. 3d 296, 390 N.E.2d 428.

■■■ In the pending case the two signed documents contain all of these

---

[1] Thomas Crum is the sole shareholder of the corporation.

elements. They are facially complete records of the agreement between Crum and Krol. We find, therefore, that since Krol is the party to be charged in this case, he cannot use his brothers' failure to approve and sign the documents as the basis for his Statute of Frauds defense.[2] Nevertheless, a writing that complies with the Statute of Frauds is not necessarily a valid contract, but only evidence of one. (*Hall v. Humphrey-Lake Corp.* (1975), 29 Ill. App. 3d 956, 331 N.E.2d 365.) The real issue before us, therefore, concerns the intent of the parties, Crum and Krol: Did they intend to create a binding contract when they signed the documents, or was the contract conditioned upon the approval and signatures of Krol's brothers?

## B.

■■■ Krol's position is that the documents were not to be effective as contracts without the signature of his brothers and thus cannot be enforced against him. It is true that if a written contract by its terms is drafted as a mutual agreement among several parties, it must be signed by all parties in order to bind them, or it will not bind any party because the contract will remain uncompleted. (See *Santelli v. Lev* (1927), 324 Ill. 454, 155 N.E. 278; see also *Hall v. Humphrey-Lake Corp.*) Similarly, if a writing indicates that an agreement to sell realty is subject to final approval by a third party, and is otherwise contingent upon the execution of a formal contract, the writing may be deemed insufficient under the Statute of Frauds or incomplete as a final contract. See *Brunette v. Vulcan Materials Co.* (1970), 119 Ill. App. 2d 390, 256 N.E.2d 44; *cf. Barton Chemical Corp. v. Pennwalt Corp.* (1979), 79 Ill. App. 3d 829, 399 N.E.2d 288 (whether the execution of a formal document is essential to the creation of a binding contract is a question of intent).

The documents in the instant case, however, do not expressly require the brothers' approval of the transaction as a condition precedent or a contingency of the contract. Their names are not included on the documents as parties to the transaction. In construing the legal effect of the documents, therefore, the trial court evaluated extrinsic evidence of the parties' intent and resolved the conflicting testimony as a question of fact. Our review is thus limited to determining whether the court's judgment in favor of Crum is contrary to the manifest weight of the evidence. See *Sherbrooke Homes, Ltd. v. Krawczyk* (1980), 82 Ill. App. 3d 990, 403 N.E.2d 622.

Krol maintains that Crum knew of his brothers' ownership interest in

---

[2] Because of our disposition of this issue we need not determine whether Crum's conduct in moving on the land constitutes part performance of the contract, an exception to the Statute of Frauds. See generally *Anastaplo v. Radford* (1958), 14 Ill. 2d 526, 153 N.E.2d 37.

the property and understood that their signatures on the documents were necessary to complete the transaction. Accordingly, he believes that the signed contract forms must be construed as Crum's offer to purchase, which was never accepted. To support his argument, Krol focuses on certain parenthetical language in the documents which was inserted after the words, "Name of Seller: Andrew Krol." The language provided as follows: "Permission to enter names of titleholders at time of execution hereof by seller." According to Krol, this language put Crum on notice of the existence of other potential titleholders from the beginning of the negotiations.

■■ ■ We disagree with Krol's inference that Crum's awareness of other possible owners would necessarily prevent the execution of a valid contract between him and Krol. Under Illinois law, the grantor of real estate need not have title at the time the contract is made (*White v. Bates* (1908), 234 Ill. 276, 84 N.E. 906; *Bissett v. Gooch* (1980), 87 Ill. App. 3d 1132, 409 N.E.2d 515); it is the promise to convey title that is the basis of the contract. (*Breiling v. Hybl* (1912), 167 Ill. App. 165; see *Sherbrooke Homes, Ltd.*) A breach of such a promise may be compensated in damages even though the contract cannot be specifically performed. Thus, although the trial court in the present case could not order Krol to convey the entire property, in derogation of the rights of the other titleholders (*White v. Bates*; see also *Dineff v. Wernecke* (1963), 27 Ill. 2d 476, 190 N.E.2d 308), Crum is entitled to damages for Krol's breach of promise to convey the deed as long as the evidence supports the conclusion that an actual contract was formed.

The record indicates that Krol represented himself as owner of the property, both in the listing agreements with Bergnach and on the real estate sale contract forms. Although there was a dispute as to when Crum learned that others had an owership interest in the property, there is evidence to support Crum's position that he learned of the other title-holders in June or July of 1976, at the meeting to close the transaction, approximately three months after the contracts were first executed and one month before the price changes were finally initialled. Moreover, after Krol signed the agreements and negotiated price terms and other matters, he allowed Crum to enter the land and establish his trucking operation. He also helped fulfill the contingencies listed in the contract. This conduct is evidence of Krol's intention to form a binding contract with Crum. Again, we emphasize that Krol had the option of making the contract expressly subject to the approval and signatures of the other titleholders. We refuse to read in an implied condition to that effect; the factual resolution of the parties' intent was for the trial court to determine. We conclude that the court's findings are not against the manifest weight of the evidence.

## C.

Krol cites two final reasons why we should hold the contracts invalid: (1) failure of consideration; and (2) lack of delivery. Neither point is well taken.

To support the argument that the contractual consideration failed, Krol notes that Crum's earnest money of $6,000 was to be paid by demand note "to be redeemed when the contingencies [of the contract] have been met." By the time of trial, however, Crum had not redeemed the note, although the contingencies had been satisfied. Accordingly, Krol reasons that Crum did not complete his part of the agreement and the consideration thus failed.

This argument misconstrues the concept of consideration and misapprehends a party's obligation to redeem a demand note. As a general principle of contract law, if the consideration is a promise to perform in the future, a party's nonperformance does not cause consideration to fail; the real consideration is the *promise* to perform. (*Wilson v. Continental Body Corp.* (1981), 93 Ill. App. 3d 966, 418 N.E.2d 56.) In the present case, Crum promised to pay the purchase price of the real estate in exchange for Krol's promise to convey the land. This satisfies the legal requirement of consideration under their contract. Therefore, the issue of redeeming the earnest money demand note is a separate matter. Moreover, there is no evidence in the record that Krol ever demanded payment of the note, thereby triggering Crum's obligation to redeem it. We are unaware of any case which holds that the maker of a note has an obligation to pay absent the noteholder's presentment and demand for payment.

Krol finally asserts that there was no "delivery" of the documents and thus no formal contract ever arose. Although he cites no authorities and fails to clearly explain this contention, apparently he is referring to the fact that because he took the documents to be signed by his brothers and never returned the documents to Crum, the final step in the creation of the contract was never taken.

We find this theory unpersuasive. In fact, this argument is closely related to the question of the parties' contractual intent, which we have already analyzed. It has been recognized that "[o]nce the Statute of Frauds has been overcome * * * parties may have entered into a binding and enforceable contract though no *formal* contract was signed or delivered, so long as all the essential terms have been agreed upon. Conversely, where the intent of the parties is clear that they will not be legally bound until execution and delivery of a formal agreement, no contract comes into existence until that time." *Chicago Investment Corp. v. Dolins* (1981), 93 Ill. App. 3d 971, 975, 418 N.E.2d 59, citing *Chicago Title & Trust Co. v. Ceco Corp.* (1980), 92 Ill. App. 3d 58, 415 N.E.2d 668.

We need not repeat the facts in support of the trial court's determination that Crum and Krol entered into a binding contract for the sale of the real estate. The written documents and the parties' conduct are proof of their contract; Krol's failure to return the papers to Crum following the July 1976 meeting does not constitute a defense to the contract action.

## II

■■ Krol next argues that the trial court should have granted his motion for a directed verdict at the close of Crum's case. We reject this contention summarily because Krol proceeded with his evidence following the denial of the motion and, consequently, this point is now moot. (See *Goldberg v. Capitol Freight Lines, Ltd.* (1942), 314 Ill. App. 347, 41 N.E.2d 302, *aff'd* (1943), 382 Ill. 283, 47 N.E.2d 67.) To preserve the question of whether Crum established a *prima facie* case, Krol would have had to make a second motion for a directed verdict at the close of all the evidence. (*Smith v. McNeil Corp.* (1979), 74 Ill. App. 3d 356, 392 N.E.2d 1376; see Ill. Rev. Stat. 1977, ch. 110, par. 68.1.) Moreover, as our review of the evidence indicates, a directed verdict in favor of Krol would have been inappropriate under the *Pedrick* standard, which requires the evidence, when viewed most favorably to the opponent of the motion, to favor the movant so overwhelmingly that no contrary verdict based on the evidence could stand. (*Pedrick v. Peoria & Eastern R. R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Hence, we find no error involving the court's ruling on the directed verdict motion.

## III

■■ Defendant's next point of alleged trial error focuses on the corporate entity, Thomas Crum & Associates, Inc., and its relationship to this lawsuit. Krol points out that Crum filed this action in his individual capacity. Nevertheless, he testified that the corporation paid the bills he was claiming as his personal damages. Krol poses a two-part argument based on the principle that a corporation is legally distinct from its sole shareholder. First, he contends that Crum cannot personally recover the expenditures incurred by the corporation. Second, Krol maintains that he and the corporation were not in privity of contract and therefore the corporation cannot recover damages and should not have been added as a party plaintiff.

Before examining these theories, we note that throughout the trial both Crum and Krol concentrated their efforts on the central question of whether a contract existed between them and whether the Statute of Frauds should apply. The record indicates that the first real discussion of the corporation's separate identity took place following the trial, during

the parties' closing arguments.[3] From our reading of the transcript it is apparent that the parties either assumed that the corporation and Crum were "one" for purposes of damages or they just failed to closely consider it. In either case, they did not seriously pursue this issue until the discussion during closing arguments in which the trial court allowed the corporation to be joined as party plaintiff.

The trial court, after considering the parties' written memoranda of law and oral argument, found that Crum had established the elements of his breach of contract action and rejected the argument that the corporation's name on the checks precluded Crum's recovery. The court then added the corporation as a party, pursuant to section 26 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 26), which provides in pertinent part that:

> "New parties may be added and parties misjoined may be dropped by order of the court, at any stage of the cause, before or after judgment, as the ends of justice may require and on terms which the court may fix."

The trial court agreed with Crum that the corporation was, functionally, his alter ego which would justify disregarding the corporate entity. Further, the court cited evidence that Krol had known of the corporation's existence from the beginning and was not unfairly surprised or otherwise prejudiced by the joinder of the corporation.

Within the context of the above considerations we next address Krol's specific arguments pertaining to the issues of joinder and piercing the corporate veil under the alter ego theory.

## A.

Of the several provisions in the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 1 *et seq.*) that deal with the joinder of the parties, section 26 seeks to cure defects of misjoinder or nonjoinder of parties without turning the case out of court. (*Thompson v. Otis* (1936), 285 Ill. App. 523, 2 N.E.2d 370.) By its terms it prevents an action from being dismissed for misjoinder of parties and, in the case of nonjoinder of necessary parties, prevents dismissal of the case without reasonable opportunity to add to them. When a party is added after judgment is rendered, the courts have ruled that the post-judgment parties can be added only if they are "necessary" parties and only in the event the judgment in the original action has not been satisfied. (*Zieler v. Village of Oak Lawn* (1974), 23 Ill.

---

[3] It is true that during Crum's case-in-chief, defense counsel objected, on relevancy grounds, to the court's receiving plaintiff's evidence of the corporate bills. However, defendant later offered, as his own exhibits, copies of the corporation's cancelled checks that were used to pay the bills in evidence. In so doing he effectively waived the relevancy objection to this evidence.

App. 3d 752, 320 N.E.2d 86.) A necessary or indispensable party has been defined as one whose interest in the controverted matter is such that the litigation cannot be resolved without either affecting that interest or leaving the interests of the parties before the court in an embarrassing or inequitable position. (*Rubin v. Boorstein* (1979), 73 Ill. App. 3d 689, 392 N.E.2d 919.) The policy behind the requirement of joining indispensable parties is that the entering of a judgment without such party may result in the absent party's loss of a property right without due process of law. (*Rubin.*) In addition, an indispensable party's absence may adversely affect the interests of those already before the court and prevent the complete resolution of the controversy. *Lerner v. Zipperman* (1979), 69 Ill. App. 3d 620, 387 N.E.2d 946.

These general principles do not aid Krol's contention that because the corporation was not a necessary party, it was misjoined, causing detriment to defendant. The record indicates that the court permitted the addition of the corporation, as a convenience or formality, to ensure defendant's payment of the damages resulting from his breach of contract. The court had allowed the joinder after holding, in effect, that the corporate identity should be disregarded as the alter ego of Thomas Crum. That being the case, Crum would remain the real or sole party in interest. Hence, it was actually unnecessary for the trial court to formally add the corporation as a party plaintiff. That joinder was allowed, however, did not prejudice Krol because it did not increase his liability beyond what was already established, assuming he could not escape liability to Crum completely. It becomes evident, therefore, that the significance of the joinder issue actually depends on whether the corporate entity is viewed as a separate plaintiff or as Crum's alter ego.

### B.

Krol urges us to adhere to the firmly entrenched concept that a corporation is a legal entity existing separately from its shareholders, officers, and directors (*e.g., Froehlich v. J. R. Froehlich Manufacturing Co.* (1981), 93 Ill. App. 3d 179, 416 N.E.2d 1134; *Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 415 N.E.2d 560; *Stap v. Chicago Aces Tennis Team, Inc.* (1978) 63 Ill. App. 3d 23, 379 N.E.2d 1298.) The resulting limits on a shareholder's or officer's personal liability for corporate obligations is, of course, a cornerstone of the law of corporations. The separate corporate identity may be disregarded by the courts, however, in situations where recognition of the corporate entity would "present an obstacle to the protection of private rights or where the corporation is merely the alter ego or business conduit of a governing or dominating personality." (*Gallagher*, 91 Ill. App. 3d 999, 1004, 415 N.E.2d

560, 563.) This piercing of the corporate veil is applied only when clearly justified by circumstances in a particular case (*Froehlich*), and two requirements must be met: (1) "[T]here must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist"; and (2) "circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. [Citations.]" (*Gallagher*, 91 Ill. App. 3d 999, 1004, 415 N.E.2d 560, 563-64.) Disregarding the corporate entity is an equitable remedy generally imposed to rectify an abuse of corporate privilege. (See *Wikelund Wholesale Co. v. Tile World Factory Tile Warehouse* (1978), 57 Ill. App. 3d 269, 372 N.E.2d 1022.) Thus in the usual situation, the doctrine is invoked by a creditor of the corporation to reach an individual who has used the corporation as an instrument to defraud creditors. (See *Stap; Froehlich; Roepke v. Western National Mutual Insurance Co.* (Minn. 1981), 302 N.W.2d 350.) The pending case, however, requires a different application of the theory, which may be characterized as a "reverse pierce." In *Roepke*, the Minnesota Supreme Court recognized the fairness of allowing an "insider" to pierce the corporate veil from within the corporation under appropriate circumstances.

■■ We believe that the circumstances of the present case justify treating Crum and his corporation as a single entity with respect to the damages claim against defendant. While we realize that the concept of a "reverse pierce" has not been at issue in the overwhelming number of the corporate veil cases, we believe the same equitable considerations of preventing injustice should apply when it is a third party, rather than a shareholder or officer, who attempts to use the corporate entity as a shield. At least one Illinois case, *Earp v. Schmitz* (1948), 334 Ill. App. 382, 79 N.E.2d 637, supports this result. In *Earp*, a forcible detainer action, the plaintiff lessor attempted to eject defendant lessee from the leased premises on the basis that the lessee breached a provision which prohibited use of the building by "any other person" than lessee. The lessee had conducted a business in the building as a sole proprietor and then became incorporated. Lessor argued that the corporation was a distinct entity and another "person" whose occupation of the building violated the lease. In rejecting this contention, the court expressly recognized that it is not only where third parties need protection that the courts have treated a corporation and its sole shareholder as the same person. The court stated that lessor had not been misled because there had been no change in the business or people involved following the formation of the corporation. At most, the court concluded, the corporation was an agent of lessee in conducting the business and not "another person" under the lease.

We agree with the rationale of *Earp* and with dicta from a more recent case which notes that the doctrine of corporate separation "is a legal theory used for the convenience of the business world. [and] * * * cannot, therefore, be extended to a point beyond its reason and policy * * *." (*Wikelund* 57 Ill. App. 3d 269, 272-73, 372 N.E.2d 1022, 1024.) To refuse to pierce the corporate veil in this case would be to permit Krol's escape from liability, an unjust result. We conclude, therefore, that the trial court did not abuse its discretion in allowing Crum and Thomas Crum & Associates to be treated as a single entity.

## IV

■■ Krol next challenges the trial court's assessment of damages. He argues, in essence, that the trial court should not have awarded damages under both counts of the complaint because they are based on the same expenditures. To the extent that Crum's recovery under count II (unjust enrichment) duplicates expenses claimed in count I (breach of contract), we agree that this was error. Because we can easily ascertain from the record which portion of damages constituted the "double recovery," however, we will subtract that amount and modify the award pursuant to our power under Supreme Court Rule 366 (Ill. Rev. Stat. 1977, ch. 110A, par. 366(a).)

The following is a list of Crum's claimed damages under both counts of the complaint.

"Count I for damages:

| Exhibit No. | Reason | Amount |
|---|---|---|
| 17 | Architectural | $1,300.00 |
| 18 | Soil Test | 450.00 |
| 19 | Soil Test | 350.00 |
| 20 | Architectural | 80.00 |
| 21 | Tree Removal | 600.00 |
| 22 A & B | Grading and Slag | 9,500.00 |
| 23 | Architectural | 16.00 |
| 24 | Septic Trench | 425.00 |
| 25 | Telephone | 354.20 |
| 26 | Well Repair | 65.00 |
| 27 | Electric | 335.00 |
| 28 | Insurance | 358.00 |
| 29 | Electric | 284.65 |
| 30 | Well Repair | 30.00 |
| 31 | Attorney's Fees | 4,200.00 |
| | TOTAL | $18,347.85 |

Count II for unjust enrichment (value of improvements):

| Exhibit No. | Reason | Amount |
|---|---|---|
| 21 | Tree Removal | $  600.00 |
| 22 A & B | Grading and Slag | 9,500.00 |
| 24 | Septic Trench | 425.00 |
| 26 | Well Repair | 65.00 |
| 27 | Electric Lines | 335.00 |
| 29 | Electric Pole | 284.64 |
| 30 | Well Repair | 30.00 |
| | TOTAL | $11,239.65 ÷ 3 |

[As 1/3 owner, Andrew Krol is accountable for 1/3 of the value of the improvements for a total of $3,746.55.]"

The trial court disallowed the attorney's fees and the telephone costs but permitted Crum to recover $13,435.65 under count I and $3,746.55 under count II, which lists seven items already included in the first count.

Generally, the policy of contract damages is to place the injured party in the monetary position he would have been had the contract been performed. (15 Ill. L. & Prac. *Damages* §145 (1968).) Thus, a party seeking damages for a breach of contract to sell land can recover the increased value of the land over the contract price at the time of the breach. (*Spangler v. Holthusen* (1978), 61 Ill. App. 3d 74, 378 N.E.2d 304.) In addition, expenses incurred as a result of the breach are generally recognized as an element of damages. 15 Ill. L. & Prac. *Damages* §59 (1968); 5 Corbin on Contracts §1032 (1964).

As an alternative to damages based on a formal contract, a party might seek restitutionary relief, which is aimed at restoring to a party the value of something given up without compensation. Restitutionary relief should be distinguished from full recovery under a contract, which is premised on the value of the performance promised. (See 5 Corbin on Contracts §996, at 17 (1964).) A party's expenditures in reasonable reliance of performance (the basis of Crum's expenses) may be recovered under either theory, as "consequential damages" of the breach, or, in some circumstances, as part of the measure of restitution. (5 Corbin on Contracts §1032 (1964).) These two theories of relief, contractual damages and quasi-contractual restitution, are generally considered to be mutually exclusive; the plaintiff may recover under either theory, but not both. (J. Calamari & J. Perillo, The Law of Contracts §242, at 376 (1970).) Nevertheless, a plaintiff's restitutionary interest (including expenses incurred in reliance on the contract) is usually protected or included in a damages award. J. Calamari & J. Perillo, The Law of Contracts §242, at 377 (1970).

■■ This brief sketch of relevant contract principles indicates that the court did not err in allowing Crum to recover the expenses listed as his losses arising from Krol's breach. However, we believe that it was improper to charge defendant twice with seven of the items (listed in count II.) Thus, we believe that the $3,746.55 awarded under count II should be substracted from the total award. Accordingly, we reduce the award from $17,182.20 to $13,435.65.

### V

■■ In Krol's final argument, he states, summarily, that he should have prevailed on his countercomplaint, which charged plaintiff with creating a cloud on title of the property by recording the real estate contracts.

The argument is untenable; plaintiff had a legal right to record the fully executed and signed contracts to protect his valid claims. Even if an action to clear title would lie, however, Krol's conduct should effectively estop him from claiming damages.

For the reasons contained herein, we affirm the judgment of the trial court as to the existence of the contract and defendant's liability for breach. We modify the damages award, however, to eliminate the portion that constitutes a double recovery. The award is reduced to $13,435.65.

Affirmed in part; modified in part.

SULLIVAN, P. J., and LORENZ, J., concur.