2020 IL App (2d) 190710
No. 2-19-0710
Modified opinion filed November 17, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE JOHN FRANKLIN AND DOROTHY BICKMORE LIVING TRUST, JOHN FRANKLIN BICKMORE, and DOROTHY BICKMORE, | ) ) ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 17-CH-1279 |
| | ) | |
| ASHA NANAVATI and VIMAL NANAVATI, | ) ) | Honorable |
| | ) | Daniel L. Jasica, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Zenoff and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    Asha Nanavati and Vimal Nanavati, the defendants named in a three-count complaint brought by John Franklin Bickmore, Dorothy Bickmore, and the John Franklin and Dorothy Bickmore Living Trust (Trust)[1] after a failed real estate transaction, appeal from the trial court's award of damages, fees, and costs to the Bickmores under one breach-of-contract count of the

_____

[1] The suit proceeded with the Bickmores acting as the plaintiffs, and the court ultimately entered judgment for the Bickmores but not the Trust.

complaint. The Nanavatis first contend that the contract for the sale of the real estate was invalid because only Asha signed it though both she and Vimal owned the property; hence, the finding of breach was contrary to law. Consistent with the rule in *Crum v. Krol*, 99 Ill. App. 3d 651 (1981), we hold that Asha, as part-owner of the property, could sign a binding contract to sell both her interest and the share she did not own. We hold that, contrary to the Nanavatis' contention, *Crum* is consistent with the holding in *Dineff v. Wernecke*, 27 Ill. 2d 476 (1963). The Nanavatis also contend that, because the court found for them on one count of the complaint, the court should have deemed that they were prevailing parties as to that count and were entitled to fees. We hold that the Nanavatis have forfeited this claim by failing to provide a record on appeal sufficient to support their claim of error. We therefore affirm the trial court's award of damages and fees.

¶ 2                                         I. BACKGROUND

¶ 3      On September 18, 2017, the Bickmores and the Trust filed their three-count complaint against the Nanavatis. Count I was for breach of contract (specific performance), count II was for breach of contract (money damages), and count III was for common-law fraud. The suit arose from a contract for the sale of the Nanavatis' property at 2540 Highmoor Road in Highland Park (Highmoor property) to the Trust. The Nanavatis answered, denying the core allegations of each count. The Bickmores voluntarily dismissed count I, and the remaining counts were tried to the bench. The court included detailed findings of fact in its June 5, 2019, memorandum judgment, and none of the parties contest those findings.

¶ 4      According to the court's findings, Vimal lived in California, where he worked as a physician. Asha frequently visited Vimal but lived alone in the Highmoor property. Asha took out a new mortgage on the Highmore property in 2012. On July 5, 2012, she quitclaimed the property

from herself alone to herself and Vimal to facilitate Vimal's cosigning of the mortgage and note. The quitclaim deed was not recorded.

¶ 5     Vimal knew that the mortgage documents identified him as a borrower. However, until August 2017, he was under the impression that Asha had sole title to the Highmoor property.

¶ 6     In April 2017, Vimal participated in having the Highmoor property listed for sale with real estate agent Brent Rosenbower. Rosenbower understood that Vimal would be his primary contact and that Asha relied on Vimal for advice on the sale. Nevertheless, Asha told Rosenbower that she owned the property, and Rosenbower had noted that Lake County property tax records listed her as the owner. Rosenbower also learned that, over the last 15 years, the Highmoor property was listed for sale 13 times at prices ranging from $700,000 to more than $1 million.

¶ 7     In April 2017, Rosenbower prepared a comparative market analysis for the property and sent it to Vimal. Vimal wanted to list the property for $797,000, the median price for properties in the area. Rosenbower recommended a listing price of $679,000. Asha signed a listing agreement with Rosenbower's agency on April 28, 2017; the listing price was $659,900. Vimal helped Asha sign the document electronically.

¶ 8     On June 11, 2017, the Bickmores signed a contract to sell their Glencoe residence. The contract specified an August 18, 2017, closing, but allowed the Bickmores to retain possession until January 2018, if they paid $5400 a month in rent.

¶ 9     On June 17, 2017, the Bickmores offered Asha $600,000 for the Highmoor property. They increased their offer to $652,000 on June 22, 2017, and proposed an August 18, 2017, closing. Vimal asked Rosenbower to get a later closing date or a higher price, and the Bickmores agreed to give Asha more time to move her belongings.

¶ 10 On June 27, 2017, Asha, with Vimal's assistance, electronically signed a contract accepting the Bickmores' offer of $652,000 for the sale of the Highmoor property and setting August 18, 2017, as the date for closing and possession. The contract identified Asha as the sole seller, and only Asha signed the contract. The contract provided that the seller would convey good-and-merchantable title to the buyers by warranty deed. It also provided that, in any litigation "with respect to this Contract," the "prevailing party *** shall be entitled to collect reasonable attorney fees and costs from the non-prevailing party as ordered by a court of competent jurisdiction."

¶ 11 Shortly after Asha signed the agreement, Asha and Vimal became dissatisfied with the sales price of $652,000; Vimal believed the price should have been closer to $750,000. Vimal testified that, hours after he helped Asha electronically sign the contract, he texted Rosenbower to state, " 'I'm retracting the offer [*sic*] *** I have the right within 24 hrs of signature.' " Rosenbower could not confirm that he received the text, but in any event, the contract did not give the seller the right to rescind the contract.

¶ 12 On July 2, 2017, Vimal told Rosenbower that Asha could not move out by August 18, 2017, and that he would pull out of the sale if the Bickmores did not agree to an October 30 possession date. The Bickmores agreed to change the closing and possession date to September 15, 2017.

¶ 13 On August 10, 2017, or thereabout, Vimal told Sean Weppler, an attorney whom he had retained for the transaction, that he was an obligor under the mortgage. Weppler recognized that this meant that Vimal was probably also on the title, but he found that the last recorded deed showed Asha alone as the owner. On August 14, 2017, Weppler obtained the unrecorded quitclaim deed from the mortgage company that showed Vimal was an owner. Weppler believed that Vimal's interest in the property gave the Nanavatis a basis for renegotiating the sales price.

¶ 14    On August 14, 2017, Weppler sent the following e-mail to the Bickmores' attorney:

"Sorry to spring this on you. Thank you for taking some time to speak with me this morning. Please see attached Mortgage for the subject property. As we discussed, it was at the time of this mortgage that the property was transferred from Asha Nanavati to Asha Nanavati and Vimal Nanavati. Dr. Vimal Nanavati is looking for the purchase price to be $750,000 to transfer his interest in the property. Please let me know if you would like to discuss this further or how you would like to proceed."

¶ 15    The sale of the Bickmores' Glencoe house closed, as expected, on August 18, 2017.

¶ 16    On August 18, 2017, the Bickmores informed the Nanavatis that they had financing for the purchase of the Highmoor property. Vimal responded through Weppler that he had not signed the contract and would do so only if the Bickmores agreed to pay $725,000 and accepted a September 26, 2017, closing.

¶ 17    On August 28, 2017, Weppler informed the Bickmores that Asha was prepared to convey her interest in the Highmore property for the contract price, but Vimal would not do so unless the Bickmores met his conditions.

¶ 18    No closing occurred, and, as of the trial date, the Nanavatis still owned the Highmoor property.

¶ 19    In the analysis portion of its order, the trial court found that, despite the quitclaim deed in July 2012, when Asha signed the contract in June 2017, neither Vimal nor Asha were aware (or remembered) that Vimal had an interest in the Highmoor property. The court further found that both Vimal and Asha believed that Asha was signing a binding contract to sell the Highmoor property. Moreover, because the grantor of real estate need not have title when the contract is made, that belief was correct. Thus, Asha breached her obligation to provide " 'good and

merchantable title *** by recordable Warranty Deed.' " The court further found that, when Vimal discovered that he was on the title, Vimal believed that he had an opportunity to negotiate more favorable terms for the sale.

¶ 20    The court entered a judgment for damages of $70,283.74 in the breach-of-contract claim against Asha. It entered judgment for the Nanavatis on the fraud claim on the basis that, as neither of the Nanavatis had made any direct representations to the Bickmores, no fraud had occurred. The court ruled that the Bickmores were, despite the judgment for the Nanavatis on one count, entitled to fees and costs under the paragraph of the sales contract providing for fees and costs to the prevailing party in litigation regarding the contract. Further, it stated that it had "also resolved all other credibility determinations and specific disputed facts in favor of the findings above and the decision reached below." The court denied the Nanavatis' petition for attorney fees. The Bickmores' fee petition remained pending, with deadlines set for the Nanavatis' response and the Bickmores' reply.

¶ 21    Rather than file a conventional response to the fee petition challenging the reasonableness of the Bickmores' $50,350.60 fee request, the Nanavatis filed what they called a motion for reconsideration of the court's denial of their fee petition. They contended that, because they had prevailed on the common-law fraud claim, both parties should be deemed to have prevailed.

¶ 22    On July 19, 2019, the court denied the Nanavatis' motion for reconsideration and entered judgment in favor of the Bickmores for $46,119.34 in attorney fees and $603.90 in costs; the record does not contain a transcript of the hearing on fees. These awards brought the total, with postjudgment interest included, to $116,962.98. The Nanavatis timely appealed.

¶ 23                                    II. ANALYSIS

¶ 24    On appeal, the Nanavatis raise two claims of error. One, they contend that the court erred as a matter of law in finding that Asha breached the contract. They argue that, under the supreme court's holding in *Dineff*, a real estate contract is invalid unless all persons with an interest to be conveyed by the contract are parties to that contract. Thus the court should not have found in favor of the Bickmores on the breach-of-contract claim. Two, they contend that, because they prevailed on the fraud count, the court erred in awarding attorney fees to the Bickmores only. The Bickmores respond that, under the rule in *Crum* and similar cases, a person with only a partial interest in real estate can be held liable for breach of a contract to sell the entire property. They also contend that the Nanavatis have forfeited their claim that the court's ruling on attorney fees was improper, because they failed to provide a record sufficient to support their claim of error and failed to develop their argument adequately.

¶ 25    We hold for the Bickmores on both issues. We agree with them that Asha was bound by the sales contract. We further agree that, because the Nanavatis failed to provide a record on appeal sufficient to support their claim that the court erred in not awarding them attorney fees, they forfeited that claim.

¶ 26    The core requirements for the formation of a contract are an offer, acceptance, and consideration. *E.g.*, *BMO Harris Bank, N.A. v. Porter*, 2018 IL App (1st) 171308, ¶ 53. In *Crum*, the court said:

> "Under Illinois law, the grantor of real estate need not have title at the time the contract is made [citations]; it is the promise to convey title that is the basis of the contract. [Citations.] A breach of such a promise may be compensated in damages even though the contract cannot be specifically performed." *Crum*, 99 Ill. App. 3d at 656.

¶ 27    *Crum* relied on *White v. Bates*, 234 Ill. 276, 278-79 (1908), where the supreme court stated:

"It is not essential to the validity of a contract for the sale of real estate that the grantor should have the title at the time the contract is made. It is sufficient if, when the specified time arrives, he is able to tender, and does tender, a deed as required by his contract. [Citations.] *** [T]his court [has] held that a tenant in common who made a contract to convey the entire common property was liable in damages to the purchaser for all damages sustained for a breach of the contract to convey the premises. *** It does not follow that because [the] appellee could not resort to equity for the specific enforcement of this contract against [one owner,] the contract is for that reason illegal and void."

¶ 28     The Nanavatis lift from its context *Dineff*'s remark that, " '[w]ithout the signature of both owners, no contract was formed, and there could be no breach upon which plaintiff could base an action for specific performance.' " *Dineff*, 27 Ill. 2d at 482. That statement appears in *Dineff* as part of a quotation from *Madia v. Collins*, 408 Ill. 358 (1951):

"The instant case is like that in [*Madia*], wherein we said *** 'It is obvious that plaintiff knew with whom he was dealing; that he was not misled as to the ownership; and that *his offer of purchase was made to both owners for the entire title*. Without the signature of both owners, no contract was formed, and there could be no breach upon which [the] plaintiff could base an action for specific performance. *** One cannot have specific performance in such case where the contract contemplates the sale of all the interests in the property contracted for, or none. [Citation.]' " (Emphasis added.) *Dineff*, 27 Ill. 2d at 482 (quoting *Madia*, 408 Ill. at 362).

As the full quotation makes clear, *Dineff* and *Madia* are consistent with *White*. If a potential buyer attempts to form a contract with two or more owners of the same property, then it is logical that the contract has not been finalized until all the owners have accepted. As the *Crum* court stated,

"It is true that if a written contract by its terms is drafted as a mutual agreement among several parties, it must be signed by all parties in order to bind them, or it will not bind any party because the contract will remain uncompleted." *Crum*, 99 Ill. App. 3d at 655. Without the assent of all owners in the sale of real estate, the buyer cannot demand specific performance. *Crum*, 99 Ill. App. 3d at 656. However, consistent with *White*, this rule does not mean that a single seller cannot be bound by accepting an offer to sell more than the interest she has in the property. Asha was bound by her agreement to sell the property to the Bickmores.

¶ 29    The facts in *Crum* are analogous here. In *Crum*, one brother, who owned a partial interest in a piece of land, signed a contract to sell it to a person who wanted to use it for a trucking business. When it came time to close, the other owners, the remaining brothers, refused to honor the contract. *Crum*, 99 Ill. App. 3d at 653-54. The *Crum* court noted that the buyer had intended to make the contract with the brother who signed the contract. Whether the buyer knew that the other brothers also had interests was not dispositive, and the contract was thus enforceable in an action for damages from the signatory for breach of contract. *Crum*, 99 Ill. App. 3d at 656. Asha's position here is comparable to that of the brother who tried to sell the property. The most obvious difference is that, according to the court's findings, Vimal had initially approved the original contract. But that difference only increases the case for deeming the contract to be binding.

¶ 30    The Nanavatis suggest that Asha made a binding contract to sell just her interest in the property and that the Bickmores were the ones that failed to perform. That suggestion is inconsistent with the language of the contract, which provided for the conveyance of good and merchantable title by warranty deed. Further, it is inconsistent with the fact that neither Asha nor the Bickmores knew of Vimal's interest in the property when the contract was signed. "An enforceable contract must include a meeting of the minds or mutual assent as to the terms of the

contract." *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 30 (1991); see also *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 51. Because neither Asha nor the Bickmores were aware of Asha's incomplete interest in the property, the only contract that the parties could have formed was one for the entire interest. Thus, the suggestion that the Bickmores reneged on the contract by failing to purchase Asha's interest is unsupportable.

¶ 31 The Nanavatis next argue that the trial court should have deemed that they were prevailing parties under the terms of the real estate contract as much as the Bickmores were and thus should have received attorney fees. We agree with the Bickmores that the Nanavatis have forfeited this claim by failing to provide a record on appeal sufficient to support their claim of error.

¶ 32 Initially, we note that we disagree with the Bickmores that the Nanavatis forfeited their argument on this issue by failing to develop it adequately. Under Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018), argument in the appellant's opening brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." The Nanavatis set out their argument on this point in several paragraphs containing multiple citations to the authorities on which they rely. The degree to which they have developed the argument goes well beyond the minimum standard to avoid forfeiture. The Bickmores contend, however, that the Nanavatis forfeited the argument because they did not "present[ ] any legal authority to support [their] contention that it would have been *** proper and appropriate for the trial court to simultaneously grant both the Bickmores' Fee Petition and the Nanavatis' Petition for Fees." To the extent that the Bickmores merely point out that the Nanavatis have failed to supply a citation that directly supports their claim, they are correct. However, that failure goes to the strength of the Nanavatis' argument and not to whether the argument complies with the rules for appellate briefs.

¶ 33    However, although the Nanavatis have adequately presented their argument, they have failed to provide a record of the hearing on attorney fees. Under the rule of *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984),

> "an appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis."

We must resolve against the appellant any doubts that arise from the incompleteness of the record. *Foutch*, 99 Ill. 2d at 392.

¶ 34    The Nanavatis contend that, because the parties agreed to present their closing arguments in "simultaneous briefs," we must assume that all the parties did at the hearing was to argue the application of the law to evidence appearing elsewhere in the record. We disagree. Initially, we are not persuaded that the agreement to closing argument by briefs necessarily bound the parties to a particular procedure for the hearing on the Nanavatis' motion for reconsideration. Even if that were the parties' expectation, they could agree to a different procedure. A hearing on fees, more than a typical nonevidentiary hearing, invites the introduction of new facts through attorney representations. The record fails to show that no such representations occurred. If, as the Nanavatis contend, the hearing was strictly confined to legal argument, the Nanavatis could have demonstrated that fact even through something short of a transcript such as a bystander's report or agreed statement of facts. See Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017). Moreover, even argument strictly on the issues of law may have affected the outcome here. For instance, the parties may have addressed whether Vimal, as a nonparty to the sales contract, was entitled to contractual

attorney fees. We thus conclude that the Nanavatis have failed to supply a record on appeal sufficient to support their claim of error.

¶ 35    After we issued this opinion, the Bickmores filed a petition asking us to award them $13,500.00 in attorney fees and $845.13 in costs related to their defense of this appeal or, in the alternative, to remand the matter for the trial court to consider their entitlement to such fees. We take the second course.

¶ 36    Under the rule in *Erlenbush v. Largent*, 353 Ill. App. 3d 949, 953 (2004), an appeal is a continuation of the litigation for purposes of awarding fees under a fees clause in a contract. The *Erlenbush* court thus concluded that the prevailing party on appeal was entitled to fees under such a clause. *Erlenbush*, 353 Ill. App. 3d at 953. Further, reviewing prior cases, it concluded, "Because 'the amount of attorney fees *** on appeal are more properly determined upon a petition and evidentiary hearing in the trial court [citation], [the reviewing court should] remand the cause for such petition and evidentiary hearing.' " *Erlenbush*, 353 Ill. App. 3d at 953 (quoting *Exchange National Bank of Chicago v. Sampson*, 186 Ill. App. 3d 969, 976 (1989), and citing *Wilmette Partners v. Hamel*, 230 Ill. App. 3d 248, 265-66 (1992)). We agree with the *Erlenbush* court on both points. We thus conclude that the Bickmores, as the prevailing party in this appeal, should be allowed to file a petition in the trial court under the contract's fees clause.

¶ 37                                    III. CONCLUSION

¶ 38    For the reasons stated, we affirm the judgment in favor of the Bickmores in the breach-of-contract action and the award of attorney fees to the Bickmores only. We further remand the cause to the trial court to permit the Bickmores to file a petition under the fees clause of the sales contract for their fees and costs on appeal. We direct the trial court to deem the Bickmores a prevailing party under the fees clause of the contract.

¶ 39    Affirmed and remanded with instructions.

---

**No. 2-19-0710**

---

| | |
|---|---|
| **Cite as:** | *John Franklin & Dorothy Bickmore Living Trust v. Nanavati*, 2020 IL App (2d) 190710 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 17-CH-1279; the Hon. Daniel L. Jasica, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | C. Jeffrey Thut, of Noonan, Perillo & Thut, of Waukegan, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Paul N. Bonadies and Christopher J. Miller, of Dahl & Bonadies, LLC, of Chicago, for appellees. |

---