BARTON CHEMICAL CORPORATION, Plaintiff-Appellant, *v.* PENNWALT CORPORATION, Defendant-Appellee.

First District (1st Division)   No. 78-1963

Opinion filed December 28, 1979.

Allen C. Engerman, Barry A. Erlich, and Belle Lind Gordon, all of Solomon, Rosenfeld, Elliott, Stiefel and Engerman, Ltd., of Chicago, for appellant.

Steven D. McCormick, of Kirkland & Ellis, of Chicago, for appellee.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Plaintiff, Barton Chemical Corporation, filed this suit for declaratory judgment, seeking an adjudication that it had a "firm price" contract to purchase chlorine and caustic soda for the year 1976, from defendant Pennwalt Corporation. Plaintiff alleged that the contract, though oral, was later confirmed through a letter sent by defendant's regional sales manager, thus satisfying the Statute of Frauds.

Defendant filed a motion for summary judgment denying that it ever agreed to a "firm price" provision since that was contrary to trade practice. Defendant also asserted that any alleged agreement was provisional since a written contract, formalizing the agreement, was never issued by the home office. Subsequently, defendant's motion for summary judgment was granted and plaintiff appealed.

On appeal, plaintiff argues that the entry of the summary judgment was improper because (1) their agreement satisfied the Statute of Frauds and did not otherwise require an approved, written contract as a condition precedent to its becoming binding on the parties and (2) whether the parties agreed to a "firm price" contract for 1976 was a factual issue precluding a summary judgment.

We reverse and remand.

In 1970, plaintiff Barton Chemical Corporation and defendant Pennwalt Corporation began negotiating the first of a series of two-year requirements contracts. The first contract (1971-72), as were all subsequent contracts, was for the sale of chlorine and caustic soda to Barton. Following initial discussions, Pennwalt submitted its standard form contract to Barton. The contract contained all of the proposed terms that applied not only to the 1971-72 contract, but also to all subsequent contracts as well. Included was the provision that:

"This contract is not binding on the Seller until accepted by it at its Home Office in Philadelphia, Pennsylvania."

Accordingly, the 1971-72 contract was signed by Barton's president in late 1970 and accepted by an official at Pennwalt's Philadelphia office on January 5, 1971. Each of the contracts executed from 1970-75 was the result of the same procedure.

Because of price instability in the bulk chemical industry, Pennwalt's contract forms included a "price adjustment clause" which allowed Pennwalt to raise prices quarterly or on 30 days' notice. It also provided that Barton could obtain chlorine and caustic soda from another supplier and thereby be released from the contract if a lower price was available.

These clauses were the subject of negotiation and were often modified during the contract period. At times, the clauses were deleted, creating a fixed price ("firm price") contract, deleted initially and reinstated later, or left intact. The modifications would subsequently be confirmed in letters originating from Pennwalt's home office or, as more often the case, from the regional office in Chicago.

In December of 1973, Pennwalt sought to renegotiate the 1973-74 contract prices. Subsequently, the parties agreed instead to negotiate a new contract for the 1974-75 term. New contract forms were prepared. Stricken was the provision allowing Pennwalt to raise prices quarterly or upon 30 days' notice. The parties had agreed to a "firm price" contract.

In 1974, despite the fact that the parties agreed to a "firm price" contract, Pennwalt twice requested that it be allowed to raise prices. The first request was agreed to orally by Barton on May 24, 1974. It was later confirmed by letter from George Grogan of Pennwalt.

The second price increase request was made by Pennwalt in September of 1974. Discussions were originally held in Philadelphia. It

was then decided that negotiations should continue in Chicago with Pennwalt's regional manager, Mr. Rowe.

After the meeting in Philadelphia, but before the negotiations in Chicago, Pennwalt's Philadelphia manager, Mr. Grogan, instructed Mr. Rowe by letter *not* to agree to a firm price contract.

On October 18, 1974, negotiations continued in Chicago between Mr. Rowe and Mr. Engerman, Barton's president. Accounts of the meeting differ. Engerman testified that Mr. Rowe and he specifically agreed upon a firm price extension through 1976 in return for a second price increase. Rowe testified that he "probably told" Engerman that there could be no firm price extensions. Following the October 18 meeting, Mr. Rowe sent a letter, dated October 21, 1974, confirming the negotiations concerning the 1974-75 contract:

> "Confirming our discussions of October 18 and 21, effective November 1, 1974, we will bill chlorine at $92.50 per ton and caustic soda at $100.00 per ton. All other terms and conditions of our current contract remains unchanged. During 1975 the tonnage will be increased by 500 tons on each product. This makes the Chlorine quantity 3,000 tons maximum (250 tons per month) and the Caustic Soda quantity 3,800 tons maximum (317 tons per month).
>
> As soon as our new contract forms arrive I will forward to you an extension through December 31, 1976."

Nearly a year later, in October 1975, Mr. Rowe of Pennwalt met again with Mr. Engerman to discuss the 1976 chlorine and caustic soda contracts and the possibility of firm price contracts for 1976. No agreement was reached.

Two months later, further meetings were held. At this time Barton's president tendered the October 21, 1974, letter as Pennwalt's confirmation that an oral, firm price contract for 1976 had been made.

This contention was denied by Pennwalt. To date, the written contract anticipated in the October 21 letter has not been executed, though Pennwalt has received the benefit of the price increases set forth therein.

In 1976, Pennwalt refused to sell chlorine and caustic soda to Barton upon the terms in effect through 1975. As a result, Barton filed a suit for declaratory judgment in an attempt to establish that a firm price contract existed between the parties for the year 1976. Pennwalt filed a motion for summary judgment alleging that as a matter of law, no contract existed for that year. The motion was granted and Barton appealed.

On appeal, Barton first argues that the trial court erred in holding that the oral agreement of October 18, 1974, between Mr. Rowe and Mr. Engerman, was unenforceable because it was never reduced to writing.

Barton contends that Mr. Rowe's confirmation letter of October 21, 1974, was sufficient to satisfy the Statute of Frauds. Barton also contends that the confirmation letter's reference to "new contract forms" being forwarded, did not mean, as a matter of law, that no binding contract existed until such forms were signed.

■■ We agree. The agreement for the sale of chlorine and caustic soda to Barton for the year 1976 represented a contract for sale of goods in excess of $500. In order to be enforceable, it must comply with the statute of frauds which requires "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." (Ill. Rev. Stat. 1977, ch. 26, par. 2—201(1).) We believe the letter of October 21, 1974, from Pennwalt's regional manager, Mr. Rowe, confirming the October 18 negotiations with Barton's president, satisfied the Statute of Frauds. The purpose of the October 18 meeting was to discuss Pennwalt's request for a second price increase on the 1974-75 contract. Although disputed by Pennwalt, the possibility of extending the contract through 1976 also was allegedly discussed. On October 21, Mr. Rowe sent the letter confirming the newly agreed-upon contract modifications that resulted from these discussions. Clearly set forth in the letter were the new price and quantity increases. More importantly, for purposes of this appeal, was the last line of the letter which indicated that the recently modified 1974-75 contract was to be extended through December 31, 1976. "All other terms and conditions of the contract were to remain unchanged." Because of the clear and comprehensive nature of the letter we are convinced that the Statute of Frauds has been satisfied.

Pennwalt's primary argument in support of the summary judgment is that no binding contract for 1976 was achieved because the agreement reached by Mr. Rowe and Mr. Engerman was never finalized. Pennwalt argues that prior dealings and the last line of the October 21 letter required that written contracts, incorporating the modifications and approved by the home office, had to be executed as a condition precedent to establishing a binding contract. We disagree.

■■ ■ In Illinois, whether a binding contract exists only after formal documents are extended is a question of intent. In *Harris v. American General Finance Corp.* (1977), 54 Ill. App. 3d 835, 839, 368 N.E.2d 1099, 1103, the court noted:

> "It has been held, moreover, that where, as here, the formal contract is to be substantially based upon the terms of the earlier agreement, a *clause contemplating execution of formal documents does not reduce the earlier agreement to a mere negotiation.*" (Emphasis added.)

As the court went on to note, "While the parties may decide that there is

no contract until formed documents are executed, this is largely a question of intent." (*Harris.*) Consequently, the mere reference to the execution of a formal, written contract does not necessarily end the inquiry as to what the parties intended. As noted in *Lambert Corp. v. Evans* (1978), 575 F.2d 132, 135:

> "Even if parties agree, point by point, on all the terms of a contract, *if they understand that the execution of a formal document shall be a prerequisite to their being bound, there is no contract until the document is executed.* On the other hand, *if it is agreed that a formal document will be prepared to memorialize a bargain the parties have already made, the bargain is enforceable even though the document has not been executed.*" (Emphasis added.)

See also *Borg-Warner Corp. v. Anchor Coupling Co.* (1958), 16 Ill. 2d 234, 156 N.E.2d 513; *Welsh v. Jakstas* (1948), 401 Ill. 288, 82 N.E.2d 53.

In the present case, prior dealings between Barton and Pennwalt would indicate that a formal contract approved by Pennwalt's home office was a condition precedent to a binding contract and that the October 18, 1974, agreement was only provisional. Yet, the fact remains that while no formal, written contract was ever executed, effective November 1, 1974, the parties began complying with the new price and quantity terms set forth in Mr. Rowe's confirmation letter of October 21. Their conduct thus indicates that both parties intended to be bound even in the absence of a formal contract. Though Pennwalt now challenges the validity of the agreement, it is doing so only after reaping the benefits of the terms it sought, namely, increases in the price and quantity of chlorine and caustic soda to be sold to Barton. Consequently, we find little merit to Pennwalt's contention that a binding contract did not exist. We conclude that the conduct of the parties and the clear language of the October 21, 1974, letter firmly establishes that the parties renegotiated the price and quantity terms of the 1974-75 contract.

Plaintiff next argues that whether the parties agreed to a "firm price" contract for 1976 was a factual issue precluding a summary judgment. We agree. The evidence on this issue is conflicting. While the October 21, 1974, letter indicated that an extension through 1976 may have been granted, the evidence presented by defendant indicated that such an extension was not only unauthorized, but also contrary to industry practice at that time. Consequently, because there existed a material issue of fact as to what the parties intended, a summary judgment was improper. *Connelly v. Uniroyal, Inc.* (1979), 75 Ill. 2d 393, 389 N.E.2d 155; *Century Display Manufacturing Corp. v. D. R. Wager Construction Co.* (1978), 71 Ill. 2d 428, 376 N.E.2d 993; *Econo Lease, Inc. v. Noffsinger* (1976), 63 Ill. 2d 390, 349 N.E.2d 1.

Defendant relies heavily on *Brunette v. Vulcan Materials Co.* (1970), 119 Ill. App. 2d 390, 256 N.E.2d 44, for the proposition that there can be no contract until the condition precedent that a formal contract be executed, is fulfilled. *Brunette* involved correspondence between the parties that was consistently phrased *in futuro* and affirmatively indicated that further approval was necessary. Consequently, *Brunette* is distinguishable from the present case.

For the foregoing reasons, the order of the circuit court of Cook County granting defendant's motion for summary judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Order reversed, cause remanded.

GOLDBERG, P. J., and CAMPBELL, J., concur.