712 F.2d 270
 1983-2 Trade Cases P 65,679
 OHIO-SEALY MATTRESS MANUFACTURING COMPANY, Sealy Mattress
Company of Houston, Sealy Mattress Company of Fort Worth,
Sealy Mattress Company of Puerto Rico, Inc., Sealy of the
Northeast, and Sealy Mattress Company of Georgia,
Plaintiffs-Appellants,
v.
Morris A. KAPLAN, Sealy Mattress Company of Illinois,
William H. Walzer, Sealy Connecticut, Inc., Sealy Greater
New York, Inc., Waterbury Mattress Company, Morton H.
Yulman, Sealy of Eastern New York, Inc., Sealy of Minnesota,
Inc., Peter D. Brown, Sealy Mattress Company of Michigan,
Inc., T.C. Englehardt, Jr., Fred G. Hodges Bedding Company
(A/K/A Sealy Mattress Company of Reading, Pa.), Sealy of Des
Moines, Inc., Walter Hertz, Sealy Mattress Company of New
Jersey, Inc., Joseph V. Moffitt, Sealy of the Carolinas,
Peerless Mattress Company, Lloyd B. Rosenfeld, Sealy
Mattress Company of Oregon, Joseph R. Rudick, Maryland
Bedding Company, James Thompson, Howard G. Haas, Sealy
Incorporated, Sealy Spring Corporation, Sealy Mattress
Company of Colorado, Inc., Sealy Mattress Company of
Northern California, Inc., Sealy Mattress Company of
Southern Carolina, Inc., Sealy Mattress Company of Arizona,
Inc., Sealy Mattress Company of Florida, Inc., Sealy
Mattress Company of Pittsburgh, Inc., and Sealy Mattress
Company of Philadelphia, Inc., Defendants-Appellees.
 No. 82-2367.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 28, 1983.
Decided July 7, 1983.
 
 Frederic F. Brace, Jr., Brace & O'Donnell, P.C., Chicago, Ill., for plaintiffs-appellants.
 Phil C. Neal, Friedman & Koven, Chicago, Ill., for defendants-appellees.
 Before CUMMINGS, Chief Judge, and BAUER and COFFEY, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 The issue in this case is whether Ohio-Sealy, Inc. waived its express right to arbitrate the amount of royalties due under its license agreement with Sealy, Inc. The district court, 545 F.Supp. 765, held that Ohio-Sealy waived its contractual right to arbitration when it told Sealy "[W]e stand ready to have the matter resolved by litigation or arbitration whenever you so choose." Accordingly, the district court refused to stay Sealy's counterclaim pending arbitration and ruled, as a matter of law, that Sealy was entitled to withheld royalties and late charges. We affirm.
 
 
 2
 * The controversy arose when Ohio-Sealy attempted to collect a multi-million dollar judgment[1] it had won against Sealy in a 1975 antitrust suit. The judgment had been stayed without bond, and during the stay Ohio-Sealy continued to pay Sealy royalties and other monies due under the license agreement. In March, 1976, however, Ohio-Sealy began withholding these monies and crediting them against the 1975 judgment. Ohio-Sealy also filed this action, charging that Sealy's Board of Directors was continuing to engage in the very conduct which had been held to be anticompetitive in the 1975 action. The contract claims raised in this appeal are just some of the many claims raised in Ohio-Sealy's six-count, seventy-two page amended complaint.
 
 
 3
 Sealy objected to the withholding of the monies, contending that Ohio-Sealy's action violated the license agreement. Sealy also moved to stay the new action Ohio-Sealy had just filed. The stay was granted. During the two-year stay the parties continued to dispute amounts due under the license agreement. Ohio-Sealy urged that these disputes be submitted to arbitration. Sealy responded by threatening to terminate Ohio-Sealy's license. In 1977, after considerable haggling, Ohio-Sealy made the following proposal: (1) it conceded the lawfulness of some of the royalties claimed by Sealy; (2) it issued a credit memorandum for the amount of these royalties; and (3) it offered to have the dispute over the remaining royalties resolved by litigation or arbitration. One year after Ohio-Sealy made this proposal the stay was lifted. Sealy then answered Ohio-Sealy's complaint and counterclaimed for the unpaid royalties and late charges.
 
 
 4
 After the 1975 judgment was upheld in this court and the United States Supreme Court denied certiorari, Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 585 F.2d 821 (7th Cir.1978), cert. denied, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), Sealy satisfied the judgment. Thereafter it renewed its threat to terminate Ohio-Sealy's license unless Ohio-Sealy paid all disputed royalties; Ohio-Sealy acquiesced under protest. The amount Ohio-Sealy remitted, however, did not include late charges. The disputed royalties and late charges are the subject of this appeal.
 
 
 5
 Contending that the royalties and late charges were contested on antitrust as well as contractual grounds, Ohio-Sealy requested the district court to stay consideration of the merits of Sealy's counterclaim until after arbitration. The district court, however, held that Ohio-Sealy had waived its right to insist on arbitration because, for approximately five years, it had offered Sealy the choice of resolving the dispute by litigation or arbitration. The district court also ruled on the merits of Sealy's counterclaim, granting summary judgment in Sealy's favor.
 
 II
 
 6
 Ohio-Sealy contends that the district court erred in concluding that Ohio-Sealy waived its right to arbitration. Relying on section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, Ohio-Sealy maintains that it did not waive its right to arbitration because it was not in default within the meaning of the statute. Ohio-Sealy asserts that to sustain a finding of default under section 3 the record must establish that: (1) the party seeking to invoke the right to arbitration took some judicial action inconsistent with the exercise of that right; and (2) the party opposing arbitration was prejudiced by that inconsistency. Ohio-Sealy maintains that neither of these two elements was satisfied.
 
 
 7
 Emphasizing that federal policy strongly favors arbitration and that the purpose of the Federal Arbitration Act, 9 U.S.C. § 1 et seq., is to make agreements irrevocable and enforceable, Ohio-Sealy states that it has sought arbitration consistently since 1976. Further, it maintains that it did not default within the meaning of the statute because it raised the arbitration issue in its answer and later filed a motion for a stay pending arbitration.
 
 
 8
 To determine whether a party has defaulted in proceeding with arbitration, thereby waiving the arbitration agreement, the court must analyze all the facts and circumstances. Martin Marietta Aluminum, Inc. v. General Electric Co., 586 F.2d 143 (9th Cir.1978). Prejudice and delay are significant factors the court must consider in applying the default provision of section 3 of the Federal Arbitration Act, 9 U.S.C. § 3. In re Mercury Construction Corp., 656 F.2d 933 (4th Cir.1981), aff'd sub nom. Moses H. Cone Memorial Hospital v. Mercury Construction Corp., --- U.S. ----, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); Midwest Window Systems, Inc. v. Amcor Industries, Inc., 630 F.2d 535 (7th Cir.1980).
 
 
 9
 Ohio-Sealy states that as early as October, 1977, it told Sealy to arbitrate or litigate in order to collect the disputed royalties. The record is replete with correspondence reiterating Ohio-Sealy's offer. Appendix, Vol. II at 534, 902, 904, 905, 919-20. Ohio-Sealy argues that this correspondence does not constitute participation in any judicial proceeding and, therefore, should not have been considered by the court. We cannot agree. There is no rigid rule as to what constitutes a waiver of an arbitration agreement; the issue depends on the facts of the particular case. Reid Burton Construction, Inc. v. Carpenters District Council of Southern Colorado, 614 F.2d 698 (10th Cir.), cert. denied, 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980). Delay, especially when it causes actual prejudice, may constitute default under the statute. In re Mercury Construction Corp., 656 F.2d 933 (4th Cir.1981), aff'd sub nom. Moses H. Cone Memorial Hospital v. Mercury Construction Corp., --- U.S. ----, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). See also Dickstein v. du Pont, 443 F.2d 783 (1st Cir.1971). And, the correspondence is highly relevant to whether Ohio-Sealy asserted its right to arbitration in a timely manner.
 
 
 10
 We are aware that when a party raises its arbitration right as an affirmative defense, the party seeking to prove waiver has a heavy burden. Martin Marietta Aluminum, Inc. v. General Electric Co., 586 F.2d 143 (9th Cir.1978). We believe, however, that Sealy has sustained that burden. Sealy has offered evidence that, despite the arbitration provision, Ohio-Sealy continually has offered Sealy the option of litigation or arbitration. Sealy chose litigating, filing its answer and counterclaim soon after the stay was lifted. Both parties then went forward with the litigation, engaging in extensive pretrial activities. Clearly, in view of Ohio-Sealy's participation in these proceedings, and its failure to assert its right to arbitration, Sealy was justified in concluding that Ohio-Sealy had decided to waive arbitration.
 
 
 11
 Without conceding that it was guilty of delay in seeking arbitration, Ohio-Sealy argues that assuming, arguendo, it did delay, the trial judge failed to consider whether this delay prejudiced Sealy. Ohio-Sealy asserts that the trial court's failure to consider the issue of prejudice automatically mandates reversal. Appellants' br. at 13. It is difficult to understand how Ohio-Sealy can make this assertion, for the trial judge specifically stated that "[w]aiver will be found where the party seeking to invoke the right to arbitration has taken some action inconsistent with the exercise of that right and the party opposing arbitration has been prejudiced by that inconsistency." Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., No. 76 C 810, slip op. at 22 (N.D.Ill. Aug. 20, 1982).
 
 
 12
 Similarly, it is difficult to understand how Ohio-Sealy can contend that Sealy would not have been prejudiced if Ohio-Sealy were permitted to insist on its right to arbitration after Sealy had embarked on protracted litigation. As the trial judge noted, Sealy expended considerable time and money on extensive discovery, document production and briefing on the merits of the royalty dispute. Moreover, forcing Sealy to abandon the litigation in favor of arbitration would have delayed Sealy's receipt of the unpaid, long overdue royalties.
 
 
 13
 The only action Ohio-Sealy took that can be construed as a demand for arbitration was to file the "Plaintiffs' Motion Re Counterclaim," which requested the district court to grant summary judgment in Ohio-Sealy's favor. In the alternative, Ohio-Sealy requested that, if it did not prevail on its summary judgment motion, the court "enforce the Federal Arbitration Act by staying further proceedings on the counterclaim pending resolution of the contractual issues by arbitration." Plaintiffs' Motion Re Counterclaim p 5, Plaintiffs' Appendix, Vol. II at 807.
 
 
 14
 We find Ohio-Sealy's position internally contradictory. After offering Sealy the choice of litigating arbitrable issues and actually participating in the litigation of these issues, Ohio-Sealy now seeks to avoid the results of that litigation. Ohio-Sealy cannot have it both ways. It acquiesced in Sealy's choice of litigation; now it must live with the consequences of that acquiescence. We find the district court properly held that "[h]aving consistently maintained that it stood ready to resolve the question of the royalties and attendant charges by arbitration or litigation at Sealy's pleasure, Ohio-Sealy cannot now be heard to complain that Sealy made the wrong choice." Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., No. 76 C 810, slip op. at 22 (N.D.Ill. Aug. 20, 1982) (emphasis in the original).[2]
 
 III
 
 15
 The next issue is whether the district court correctly granted summary judgment in Sealy's favor on the counterclaim. Ohio-Sealy contends that the judge erred in granting summary judgment because Ohio-Sealy's contractual defenses raised genuine issues of material fact.
 
 
 16
 The 1975 license agreement provides that Ohio-Sealy shall pay royalties on all products considered to be "Sealy Products." The agreement defines "Sealy Products" as those products that, with Sealy's approval, bear a Sealy Mark, or are manufactured according to specifications issued by Sealy (whether or not they bear a Sealy Mark), or are produced, with Sealy's approval, in Licensee's plant at specified locations. License Agreement Article I, p A, Plaintiffs' Appendix in Vol. II at 819.
 
 
 17
 After the parties had entered into this agreement, Ohio-Sealy began manufacturing bedding for Sears Roebuck. Sealy claimed royalties on these products; Ohio-Sealy insisted that this bedding did not fall within the license definition of "Sealy Products." The district court held Sealy was entitled to royalties on the bedding manufactured for Sears Roebuck because Sealy had approved the manufacture of this bedding by: (1) approving Ohio-Sealy's move from its existing plant to a larger plant which Ohio-Sealy claimed was necessary to handle increased volume, including the Sears business; and (2) approving the transportation of Sears bedding in trucks bearing the Sealy name and logo.
 
 
 18
 Ohio-Sealy claims that evidence in the record contradicts the lower court finding that Sealy approved the manufacture of Sears bedding. It states that Sealy did not pressure Ohio-Sealy to perform its contractual duty to report the volume of the Sears sales in order to ascertain the amount of royalties due on these sales and that Sealy did not attempt to collect these royalties until two years after they had accrued. This contradictory evidence, Ohio-Sealy reasons, precludes summary disposition.
 
 
 19
 Ohio-Sealy's arguments are not persuasive. As the trial court noted, the license agreement did not specify what conduct would constitute approval of the manufacture of non-Sealy label products to bring these within the royalty provisions. The record, however, reveals that Sealy was well aware that Ohio-Sealy was producing and selling bedding to Sears and that Sealy approved the use of Ohio-Sealy's plants and trucks to facilitate the Sears business. Sealy's letter approving Ohio-Sealy's move to a larger Georgia plant stated:
 
 
 20
 Although your [Ohio-Sealy's] sales reports to Sealy, Inc. have not indicated any significant increase in the Tucker plant's operating level from 1974 to 1976, we are aware of the need for increasing the volume of Sealy sales in Georgia. (Of course our current picture is incomplete, especially as to the Sears business, since your 1977 royalty report is not yet due.) We trust that the expanding business to which you refer, including the Sears business, will enable you to take full advantage of the increased capacity and greater efficiency that the new facility will provide.
 
 
 21
 Letter dated October 14, 1977, Plaintiffs' Appendix, Vol. II at 563. It is difficult to imagine a more explicit approval. Because Ohio-Sealy has offered no evidence to contradict the obvious conclusion that this approval was granted because Sealy anticipated increased sales, and, thus, increased royalties from the sale of non-Sealy label bedding, we hold that the trial judge properly granted summary judgment in Sealy's favor.[3]
 
 
 22
 Further, we find Ohio-Sealy's assertion that genuine issues of material fact exist with respect to the computation of royalties equally unavailing. Ohio-Sealy argues that the royalties on the Sears bedding were not computed in accordance with the formula contained in Article VII of the license agreement. The formula requires Ohio-Sealy to pay royalties on only one-half of its sales in excess of the Royalty Sales Base. Assuming arguendo that it is obligated to pay royalties on the sales of Sears bedding, Ohio-Sealy contends those sales should be included in the Royalty Sales Base and all royalties due Sealy should be recomputed. Instead, royalties on the Sears sales were calculated by computing the percentage of Ohio-Sealy's previous Royalty Sales Base to its total net sales and applying that percentage to the Sears sales, thereby requiring Ohio-Sealy to pay the full royalty on a higher percentage of the Sears sales than it would have paid if the Royalty Sales Base had been recalculated to include the Sears sales.
 
 
 23
 The license agreement is silent as to how to compute royalties on unreported sales disclosed by triennial audits. For this reason, the method outlined in the Sealy Policies and Procedures Manual was applied to compute these royalties. The trial judge held that Ohio-Sealy's challenge to this method of computing royalties on previously unreported sales had no merit "in light of the clear procedure mandated by the Sealy Policies and Procedure Manual followed in this case." Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., No. 76 C 810, slip op. at 30 (N.D.Ill. Aug. 20, 1982). Ohio-Sealy, however, emphasizes that the license agreement provides that no provision of this Manual "shall be binding to the extent that it shall contravene or be inconsistent with the provisions of [the license agreement]," License Agreement Article IV, p D, Plaintiffs' Appendix, Vol. II at 830-31. It claims that computing the royalties on the Sears sales according to the method outlined in the Manual instead of the method specified in the license agreement does just that. This argument is unpersuasive. If the license agreement specifies no method of computing royalties on newly discovered sales, there is nothing that the Manual can contradict.
 
 IV
 
 24
 Similarly, we have considered Ohio-Sealy's challenge to the late charges and find them to be totally meritless. The license agreement provides that "Sealy shall have the right to assess a charge of one per cent (1%) per month for late payment of royalties...." License Agreement Article VII, p F, Plaintiffs' Appendix, Vol. II at 847. Ohio-Sealy purposely withheld the royalties voluntarily causing them to be late. Therefore, they are subject to the agreed penalty.[4]
 
 V
 
 25
 Ohio-Sealy also asserts that the district court erred in rejecting its antitrust defenses to the counterclaim. These defenses were carefully analyzed, and properly rejected, by the district court. Because we agree with the district court's analysis, we need not discuss these defenses here.
 
 
 26
 Accordingly, the decision of the district court is AFFIRMED.
 
 
 
 [1]
 Judgment originally was entered for 20.4 million dollars but was subsequently reduced to 10.2 million dollars by remittur
 
 
 [2]
 Ohio-Sealy also claims that the district court erred in applying the permeation doctrine. Because the district court grounded its decision on the waiver issue we need not consider whether the permeation doctrine would have required the court to deny arbitration because the antitrust claims were inextricably intertwined with the contractual claims
 
 
 [3]
 Similarly, we think Sealy's agreement to permit non-Sealy label bedding to be transported in trucks bearing the Sealy name and logo constitutes approval, bringing the Sears sales within the royalty provisions
 
 
 [4]
 Relying on United Order of American Bricklayers & Stone Masons Union v. Thorlief Larsen & Son, Inc., 519 F.2d 331 (7th Cir.1975), Ohio-Sealy contends that the late charge is an unenforceable penalty. The district court properly held that case did not support Ohio-Sealy's contention