### MAGALLANES INVESTMENT, INC., Plaintiff–Appellant,

v.

### CIRCUIT SYSTEMS, INC., Defendant–Appellee.

### No. 92-2142.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1992.

Decided May 18, 1993.

As Amended on Denial of Rehearing June 25, 1993.

Michael A. Snyder (argued), Richard A. Forster, Ray, Robinson, Carle, Davies & Snyder, Chicago, IL, for plaintiff-appellant.

Jerome F. Crotty, Kevin P. Brown (argued), Rieck & Crotty, Chicago, IL, for defendant-appellee.

Before CUMMINGS and CUDAHY, Circuit Judges, and LAY, Senior Circuit Judge.*

CUMMINGS, Circuit Judge.

This case raises the interesting issue of whether a series of telexes exchanged between shipping brokers constituted a binding contract for the sale of the ship *Acacia.* The parties here made written offers and counter-offers, converged on the price and details of a sale, and concluded their correspondence with "deal confirmed * * * we give you hereunder recapitulation of terms and conditions agreed" (buyer) and "pleased to confirm

* The Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, is sitting by designation.

agreement to your recap of terms" (seller).[1] Ordinarily courts would call this exchange a contract. Here, however, relying on a clause containing the words "subject" and "negotiation," the district court found as a matter of law that the parties were not bound by the telexes until they signed a memorandum of agreement (MOA). We reverse because the telexes neither say nor imply that the parties intended to sign an MOA before their agreement became binding.

Sometime before August 22, 1990, Magallanes Investment, Inc. put the *Acacia* up for sale through its agent, Nedlloyd Shipbrokers Limited of London. Magallanes is a Liberian corporation with its principal place of business in Hong Kong. Since there are no agency disputes in this case, we refer to Magallanes and Nedlloyd collectively as "seller." On August 22, 1990, Circuit Systems, Inc. offered to buy the *Acacia* through its agent, W.P. Sauer Co. of Tequesta, Florida. Circuit Systems is an Illinois corporation with its principal place of business in Elk Grove, Illinois. We refer to Circuit Systems and Sauer as "buyer."

Buyer's first telex of August 22 contained fourteen numbered paragraphs that outlined detailed terms of its offer to purchase the *Acacia*. This telex specified a price of $254 per ton and explained how ballast and builder's plans would be used to corroborate the ship's weight. The telex also outlined numerous terms relating to the *Acacia's* condition upon delivery. The ship was to be delivered "free of" cargo, charter, leakage, fire damage, encumbrances, debts, taxes, maritime liens, mortgages, "and any other claims whatsoever." Buyer stated it "understood [that] the vessel is equipped with a bronze working propeller"; the engine type was noted in the same paragraph. Buyer further proposed that the *Acacia* would be delivered to Alang, India during October of 1990. The telex concluded by stating that buyer's offer would remain open until the following day, August 23.

Seller telexed the next day as follows: "[re *Acacia,*] have done utmost obtain firm counter your direction * * * [¶] the best we can do is counterfirm as follows for reply here within London opening 24/8: [¶] subject unsold [¶] accept/except [¶]". We read "accept/except" to mean that seller accepted buyer's offer except for the numbered reservations that followed, which suggested modifications to Paragraphs 1, 2, 5, 6, and 13 of buyer's offer. Seller demanded a price of $258 per ton, rather than $254, and deducted a 2 percent broker commission rather than 3 percent as in buyer's offer. Seller changed the paragraphs on delivery date and weight verification, and requested that the *Acacia's* equipment be itemized and excluded from the sale.

Buyer replied the same day. It reiterated "subject unsold," asked for a price of $255 per ton, but otherwise accepted seller's modifications to its offer. Buyer stressed that it had conceded to the lower commission and concluded, "only out of price and * * * relying on your efforts to get same concluded [¶] pl[ea]se call at anytime * * * don[']t let's lose this one". Later that day the brokers arrived at a price of $257 per ton in a phone conference.

The next day, on August 24, buyer telexed "pleased to confirm that obtained buyer's authority to conclude at [$257 per ton], wherefore deal confirmed cleanly. For clarity sake we give you hereunder recapitulation of terms and conditions agreed as per our understanding." The remainder of the telex was identical in form and most details to buyer's August 22 offer, but it reflected the negotiations of the previous two days and it was not styled a "firm offer." It also did not begin with the words "subject unsold," as the negotiating telexes had. Paragraph 1 was changed to show the final price of $257 per ton and the broker's commission originally outlined in Paragraph 13. Paragraph 2 contained revised delivery and cancellation dates. Paragraph 5 included a statement that the *Acacia's* "hired equipment" would be "itemised in the memorandum of agreement." Paragraph 7 reflected minor adjustments to the method of calculating the ship's weight. Paragraph 12 was changed to read "this recapitulation and sale are to be treated

---

**1.** The telexes are written entirely in upper-case type; for the reader's ease, all quotations from the telexes in this opinion will appear in lower-case type.

as a private and confidential negotiation;" the August 22 version had begun "this offer and subsequent negotiation and sale, if concluded, are to be treated". Buyer's telex ended with "thanks for all your good work in getting in there". Seller responded by telex the same day, "pleased to confirm agreement to your recap of terms".

The question before this Court is whether the exchange ending in the August 24 "recap of terms" and "confirm agreement" telexes formed a binding contract for the sale of the *Acacia*. Buyer argues that there was no contract because Paragraph 11, which never varied over the exchange, required the parties to sign an MOA before the sale outlined in the telexes became binding. Seller argues that the August 24 telexes bound the sale of the *Acacia*, and that the signing of an MOA would have been a mere formality to memorialize the pre-existing contract created by telex.

■■■ As an initial matter, "contracts for the sale of a ship are not 'maritime' and thus admiralty jurisdiction does not apply." *Chase Manhattan Financial Services, Inc. v. McMillian*, 896 F.2d 452, 460 (10th Cir.1990); *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 164 (5th Cir.1979).[2] This means that the existence of a contract in the present case is determined "by reference to the appropriate state law, not the general maritime law." *Puamier v. Barge BT 1793,* 395 F.Supp. 1019, 1028 (E.D.Va.1974) (Florida Uniform Commercial Code ("UCC") governs sale of ship); *Chase Manhattan*, 896 F.2d at 460 (state law determines when ship title passed); *Chi Shun Hua Steel Co. v. Crest Tankers, Inc.*, 1990 A.M.C. 2816, 1990 WL 265970 (N.D.Cal.)[3] (California UCC governs ship sale); Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 26 n. 90 (1975). Here the disputed telexes ran between Florida and London. The ship was to be transferred from buyer to seller in India. Buyer has ties to Liberia or Hong Kong, seller to Illinois. Though their transaction presents potential conflicts of law issues, the parties only argue Illinois contract law. Ordinarily, when parties agree on choice of law, we need not address the issue further. *SNACI, SLR v. Illinois Foundation Seeds, Inc.*, 830 F.2d 90, 92 n. 1 (7th Cir.1987).

Here, however, Paragraph 11 of the disputed telexes contains an arbitration clause that purports "to incorporate arbitration London with English law to apply." Federal law provides that "A written provision in any * * * contract * * * to settle by arbitration a controversy * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist * * * for the revocation of any contract." 9 U.S.C. § 2. Courts have read this statute, the Arbitration Act, to manifest a "liberal federal policy favoring arbitration agreements", *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, and thus we briefly explain why this case need not be ceded to English arbitrators.

■■■ The Arbitration Act was designed to guarantee enforcement of private contractual arrangements. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444. Because "arbitral jurisdiction is rooted in the consent of the parties," *Three Valleys Municipal Water District v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140–1141 (9th Cir.1991), the existence of a contract to arbitrate is usually a threshold question for the court not the arbitrator to determine. *AT & T Technologies, Inc. v. Communication Workers*, 475 U.S. 643, 649–650, 106 S.Ct. 1415, 1418–1419, 89 L.Ed.2d 648; *Virginia Carolina Tools, Inc. v. International Tool Supply, Inc.*, 984 F.2d 113, 117 (4th Cir. 1993). The right to arbitrate also can be waived; whether the right has been waived will depend on the circumstances of each case. *Ohio–Sealy Mattress Manufacturing Co. v. Kaplan*, 712 F.2d 270, 272–273 (7th Cir.1983). A party that litigates arbitrable

---

2. As the parties allege, the district court had jurisdiction not under admiralty law, see 28 U.S.C. § 1333, but on diversity grounds, because this action is between a foreign corporation and an Illinois corporation and the amount at stake exceeds $50,000. 28 U.S.C. § 1332(a)(2).

3. This opinion gives parallel citations to A.M.C., the *American Maritime Cases* reporter, and to Westlaw when a district court opinion is not published in West's *Federal Supplement*.

questions before a federal court may waive its right to request arbitration. *Saint Mary's Medical Center v. Disco Aluminum Products Co.*, 969 F.2d 585, 589–590 (7th Cir.1992). Here the parties have waived any right to arbitrate the existence of this contract in England by choosing to contest the issue under Illinois law in federal court. Since they now prefer Illinois litigation to English arbitration, so be it.

■ The parties here agree that their telexes establish the essential terms of an agreement, and the district court correctly found that the telexes satisfy Illinois' statute of frauds.[4] 810 ILCS 5/2–201. The only dispute is whether the parties intended not to be bound under the telexes until they signed an MOA. If parties intend a writing to be binding, references in that writing to a subsequent more formal agreement will not undo the parties' intent. *Borg–Warner Corp. v. Anchor Coupling Co.*, 156 N.E.2d 513, 517, 16 Ill.2d 234, 243 (1958); 810 ILCS 5/2–204.[5] Intent may be determined as a question of law or fact. *Quake Construction, Inc. v. American Airlines, Inc.*, 130 Ill.Dec. 534, 537, 537 N.E.2d 863, 866, 181 Ill.App.3d 908, 913 (1989). If a writing (here the telexes) shows the parties' intent unambiguously, its effect may be determined as a matter of law. If it does not clearly reveal the parties' intent, evidence beyond the writing must be used to determine that intent. *Id.*

■ The district court found that three paragraphs in the telexes showed as a matter of law the parties' unambiguous intent not to be bound until they signed an MOA. The problem with this analysis is that the three paragraphs—numbers 10, 11 and 12 of buyer's August 24 telex—neither say nor imply this. Paragraph 10 states that a deposit will coincide with the signing of an MOA. It does not say that the agreement documented in the telexes does not become binding until an MOA is signed or a deposit is made.

Paragraph 11 in its entirety reads "otherwise subject mutual agreement contract format which to incorporate arbitration London with English law to apply." The district court cited cases finding that the words "subject to" in a contract often indicate that the parties intended not to be bound until the "subject to" condition was fulfilled. Following these cases, the court read Paragraph 11 to mean that a binding contract was subject to the signing of the MOA mentioned in Paragraph 10. This reading was incorrect because Paragraph 11's "subject" clause is far less specific than clauses in other agreements where courts found that a binding contract was conditioned on some later event. Paragraph 11's "subject" clause has no subject. It leaves only the contract's "format" unresolved, and says nothing about whether the·telexes or the MOA will be the binding agreement.

In contrast, consider the "subject to" clause reviewed in *Interway, Inc. v. Alagna*, 41 Ill.Dec. 117, 119, 407 N.E.2d 615, 617, 85 Ill.App.3d 1094, 1096 (1980): "Our purchase is subject to a definitive Purchase and Sale Contract to be executed by the parties." *Interway* relied on this provision to conclude that the parties had not intended their letter of intent to be binding. Similar letter of intent language was reviewed in *Empro Manufacturing Co. v. Ball–Co Manufacturing, Inc.*, 870 F.2d 423 (7th Cir.1989). Unlike the telexes' Paragraph 11, the clauses in *Interway* and *Empro* specified a subject— the purchase—that was "subject to" a subsequent, expressly identified document. Here Paragraph 11 easily can be read to mean only that the MOA will be subject to a format agreeable to both parties and will provide for English arbitration. Interpolating "MOA" from Paragraph 10 into Paragraph 11, as the district court did, does not establish that the parties did not intend to be bound by telex. *Lambert Corp. v. Evans*, 575 F.2d 132 (7th Cir.1978), shows that the word "subject" does

---

4. Memorandum Opinion and Order, February 28, 1991, dismissing plaintiff's complaint. After issuing this order, the district court allowed plaintiff to submit an amended complaint, which it dismissed in an opinion dated April 16, 1992. Our opinion reviews the district court's second opinion of April 16 unless otherwise noted.

5. This provision of Illinois' UCC provides in relevant part that "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."

not have unvarying, talismanic significance in contracts analysis. There we found that the term was "nothing more than an inartful phrasing of the parties' understanding that their agreement would be formalized by [attorneys]." *Id.* at 136.

Finally, Paragraph 12 of buyer's August 24 telex provides that "this recapitulation and sale are to be treated as a private and confidential negotiation." The district court found that the word "negotiation" must mean that the parties did not intend to create a binding agreement. How then are we to read "sale"? If a single word can resolve the meaning of an entire contract, "sale" argues persuasively that the telexes were binding. "Sale" sounds final, "negotiation" does not. In either case, reliance on a single word without reference to the entire telex can be misleading. Like Paragraphs 10 and 11, Paragraph 12 provides no basis for deciding as a matter of law that the parties intended not to be bound until they signed an MOA.

So much for what the telexes do not say. If the remainder of the parties' telex exchange were ambiguous, we would need to remand for a factual investigation on whether the parties intended to form a binding agreement by telex or in an MOA. *Quake Construction*, 130 Ill.Dec. at 537, 537 N.E.2d at 866. These telexes, however, appear to state in plain, unambiguous English that the parties concluded an agreement. Buyer's August 24 telex begins "deal confirmed * * * we give you hereunder recapitulation of terms and conditions agreed." Seller responded later that day "pleased to confirm agreement." These telexes use language of offer and acceptance. Parties' signatures below the word "accepted" led the court in *Harris v. American General Finance Corp.*, 11 Ill.Dec. 491, 494, 368 N.E.2d 1099, 1102, 54 Ill.App.3d 835, 838 (1977), to recognize that a binding agreement existed even though several terms remained unresolved.

Similarly, Paragraph 12 of buyer's August 22 offering telex reads "this offer and subsequent negotiations and sale, if concluded, are

to be treated as a private and confidential negotiation." The same paragraph in buyer's August 24 telex reads "this recapitulation and sale are to be treated as a private and confidential negotiation." The changed wording indicates that the negotiation had "concluded" in a sale, as does buyer's August 24 statement "obtained buyer's authority to conclude * * *."

Other evidence supports our conclusion that the district court erred in finding as a matter of law that the telexes established a preliminary negotiation rather than a binding sale.[6] The closing telexes of August 24 do not say when the MOA will be signed. Yet the earlier telexes provided that offers and counter-offers would remain "firm" for one day, a time-frame inconsistent with open-ended negotiations that lack an express closing date. It is most unlikely that seller would have intended to withdraw its ship from the market without an express assurance of when the sale would close if the telexes were not binding. The negotiating telexes begin with the words "subject unsold;" the concluding telexes omit this language. The telexes memorialize many particulars of the sale, discussing not just price and weight but detailed terms of delivery such as the ship's engine type and the metal content of its propeller. The only matters left unresolved for the MOA are contract "format" (Paragraph 11) and "hired equipment * * * to be itemised" (Paragraph 5). These details and omissions all show that the parties intended to conclude a binding sale in the telexes.

There is more. After seller telexed "pleased to confirm agreement to your recap of terms," the parties had no contact for five days. Then on August 29 buyer's broker sent seller a telex that began "afraid have bad news." The broker feared buyer was going to renege because buyer had lost its end receiver for the *Acacia*. The broker stated it would "try to get the buyers in line as they do not wish to be placed in a position

---

6. Illinois' UCC provides that final written expressions of the parties' intent—which we take to be the August 24 telexes—"may be explained or supplemented[] by course of dealing or usage of trade * * *." 810 ILCS 5/2–202(a). Thus the remainder of this opinion need not distinguish between written evidence and course of dealing or usage of trade evidence, which includes telexes sent before or after August 24 and evidence of customs in the ship brokers' trade.

of default on the negotiation." The telex continued, "we have read the riot act to them this evening and we can only hope that by * * * tomorrow * * * the news they ⌊give⌋ us [will be] honorable." The district court read "negotiation" to mean "no contract" when another word—"default"—suggested that buyer decided to breach a binding agreement. The "riot act" phrase indicates that the broker, at least, thought that buyer was about to breach. One cannot "default" on an agreement that was never formed.

Breach was also suggested by the final telex of August 30, again from buyer to seller. Buyer said that the end receiver was only willing to pay $220 per ton for the *Acacia*, a price that left buyer with a substantial loss on the $257 per ton it had negotiated with seller. The telex stated that although buyer "understand[s] fully the implications involved in their default by non-compliance with the sale as agreed Friday last * * * they are unable to proceed with the negotiation." If the "negotiation" was not a binding sale there would be no "implications." It is hard not to read this telex as a notice of an efficient breach by buyer. Under Illinois law, parties' conduct can furnish important evidence that their preliminary writing establishes a binding contract, even when the parties plan to draft a more formal agreement. *Barton Chemical Corp. v. Penwalt Corp.*, 35 Ill.Dec. 454, 457–458, 399 N.E.2d 288, 291–292, 79 Ill.App.3d 829, 834–835 (1979); 810 ILCS 5/2–204(1).

■ Seller also submitted to the district court the affidavit of a shipping broker who stated that brokers negotiate ship sales in two stages: telexes are used to bind the main terms of the sale and the remaining details are drawn up later in a memorandum of agreement. The broker stated, "The usual and customary practice in the [shipping] trade is that a sale/purchase becomes binding upon the broker's agreement to the essential terms as expressed in this case in [the telexes of August 24]." Plaintiff's appendix at 40. The district court refused to consider this affidavit because it ruled as a matter of law that the telexes did not form a contract. Illinois' UCC aims to promote the expansion of commerce through custom and usage of

trade. 810 ILCS 5/1–102(2)(b). The UCC also provides that written agreements "may be explained or supplemented [ ] by course of dealing or usage of trade * * *." 810 ILCS 5/2–202(a). Comment 1(c) to this provision expressly rejects the rule that a court must find the language of a writing ambiguous before it considers evidence on usage of trade. These UCC Sections show that the district court erred in excluding evidence on customs of the ship broker trade whose members negotiated the sale of the *Acacia.*

Seller's affidavit is corroborated by a line of cases which recognize that the ship chartering business agrees on the essential terms of a charter in a binding telex and reserves the details for later negotiation. The leading case, *Great Circle Lines, Ltd. v. Matheson & Co., Ltd.*, 681 F.2d 121, 125 (2nd Cir.1982), states:

The shipping industry is a fast moving and ever changing business, where dealings * * * are usually conducted with a sense of urgency * * *. To bring owners and charterers together, it is the custom of the industry to deal through brokers who receive and send telex traffic all over the world.

Charter parties are formed in two stages. First, significant "main" terms are negotiated through brokers. * * * The "main" terms when agreed upon are entitled a "fixture." Second, after a "fixture" has been reached, the parties continue to negotiate "details" * * *.

Buyer argues that the ship sale and ship charter businesses are different trades; perhaps they are. But two cases following *Great Circle* suggest that sales and charters share certain terminology. *Keystone Shipping Co. v. Compagnie Marocaine de Navigation*, 1990 A.M.C. 2971, 1990 WL 104029 (S.D.N.Y.), reviewed certain "fixtures" to determine if a party was bound to arbitrate a disputed question. The court found that the words "All offers and subsequent contracts be subject to P.A. No. MO 3009" meant that the parties had agreed the fixture would incorporate a Norwegian arbitration form. In the present telexes, "subject" introduces "arbitration England," a structure similar enough to *Keystone* to suggest that the par-

ties here agreed to arbitrate disputes over their binding agreement in England. *Matter of Herlofson Management A/S*, 765 F.Supp. 78 (S.D.N.Y.1991), contains similar examples of ship chartering telexes. These include the words "hereby confirm [charters] * * * henceforth we are fully f[i]xed clean." *Id.* at 84. The *Herlofson* telexes' use of "confirm" and "clean" parallels the telex in the present case that stated "deal confirmed cleanly."

We appreciate the district court's effort to follow cases where an unambiguous "subject to" clause showed that the parties would not be bound until they signed a formal agreement. Applied to these telexes, however, this analysis missed the boat. The telexes are not ambiguous—they show that the parties reached a binding agreement to sell the *Acacia.* Because the district court dismissed seller's complaint under F.R.Civ.P. 12(b)(6), we stop short of holding as a matter of law that the parties formed a contract. On remand, buyer may present to the district court all the usual arguments parties use to challenge an unambiguous writing, such as evidence on custom of trade or course of performance. Buyer also may present facts showing no consideration[7] and reasons why it has not waived the right to English arbitration of any damages due to seller.[8]

REVERSED AND REMANDED.

[7]. Buyer's claim that any contract formed by the telexes lacked consideration is sketchy at best. If buyer promised to pay for and receive a ship, and if seller relied on this promise by taking its ship off the market, that is consideration enough.

[8]. Buyer never appealed or commented on the district court's finding that "the parties agree that Illinois law applies to this case." Memorandum Opinion and Order, Feb. 28, 1991, at 5 note 3. As we explained in the body of our opinion, buyer has waived its right to arbitrate the existence of this contract.