NOTICE
Decision filed 12/21/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220006-U

NO. 5-22-0006

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| WILLIAM JANSEN and LAVERN JANSEN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellees, | ) | Clinton County. |
| | ) | |
| v. | ) | No. 19-CH-27 |
| | ) | |
| ELLARINE SANTEL, | ) | Honorable |
| | ) | Mark W. Stedelin, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's order and judgment awarding specific performance are affirmed where the trial court's findings in determining a valid enforceable contract were not against the manifest weight of the evidence, sufficient information was contained within the initial contract and plat to find a valid, enforceable contract, and defendant held full title to the property at the time the order and judgment were entered.

¶ 2    Defendant, Ellarine Santel, appeals the trial court's order and judgment finding a valid and enforceable contract and awarding specific performance to plaintiffs, William Jansen and Lavern Jansen, related to the sale of real property. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    On December 19, 2018, plaintiffs entered into a "Sales Contract For Purchase & Sale of Real Estate," with Ellarine Santel. The subject property was located in Damiansville, Clinton

1

County, Illinois, and included the street addresses of 4612 Airport Road and 4624 Airport Road, but "exclude[d] Ellarine's house." The agreed purchase price was $400,000 payable by a nonrefundable deposit of $10,000 and the balance of $390,000 due at closing in cash or certified funds. The contract stated the "exact legal description [was] to follow," and addressed a lack of warranties as well as the "as is" condition of the property.

¶ 5 On July 5, 2019, plaintiffs filed a three-count complaint against Ellarine alleging the Jansen brothers previously leased property from Ellarine and her husband Robert Santel. Robert was residing in a nursing home, but Ellarine signed checks made payable to Robert and, at all relevant times, plaintiffs believed Ellarine had the legal authority to sign documents and enter agreements on behalf of Robert.

¶ 6 The complaint further alleged that on April 15, 2018, Ellarine informed plaintiffs that she was going to sell most of her property in the fall and offered them a chance to buy it before offering it to the public. Plaintiffs advised Ellarine of their desire to purchase the property. After plaintiffs paid their final lease payment for the year, Ellarine told plaintiffs that she was waiting until December 2018 to sell the property.

¶ 7 Thereafter, on December 16, 2018, Ellarine's son, Chris Santel, called Lavern stating that Ellarine wanted to meet to discuss selling the land to plaintiffs. On December 17, 2018, Ellarine called Lavern to schedule a meeting to discuss the sale of the land. The meeting took place on December 19, 2018. Plaintiffs, along with William's son, Matt, met with Ellarine and her children, Chris, Sonja, and Ed. The parties agreed that Ellarine would sell 76 acres to plaintiffs, which was all the land Ellarine and Robert owned, except for Ellarine's house and the surrounding 2.1-acre lot. The price, which included an abandoned house and lot at 4342 Airport Road, was set at $400,000, including a $10,000 deposit. Plaintiffs provided Ellarine with a check for $10,000 at the

2

time the contract was signed. The parties orally agreed plaintiffs could clear debris from the fence line and remove any dilapidated structures, including the abandoned home and the old fence. The following day, Ellarine cashed the deposit check.

¶ 8       The complaint further alleged that on December 27, 2018, at Ellarine's request, plaintiffs requested Netemeyer Engineering perform a survey to separate the land Ellarine planned to keep from the land included in the sale. Plaintiffs also began removing trees, brush, and other debris from the property fence line. After the survey was completed, plaintiff provided the plat to Ellarine, who signed her name, as well as Robert's name, and returned the plat to plaintiffs for the required approvals. On March 4, 2019, Ellarine's son, Chris, called Lavern and asked about the "holdup" stating Ellarine needed money and wanted the deal done. After receiving approval from the township highway commissioner, public health administrator, and the Village of Damiansville village board and zoning administrator, plaintiffs realized that Ellarine did not notarize the plat and returned the document to her.

¶ 9       The complaint alleged that thereafter, Ellarine had her brother review the plat and he told her she could have received substantially more money for the property. Following his recommendation, Ellarine blacked out her previous signatures with a magic marker, told plaintiffs she did not have authority to agree to sell on behalf of Robert, and stated the deposit would not be returned because she no longer had the money. She also told plaintiffs their farm lease was terminated, effective immediately. On April 18, 2019, Ellarine obtained power of attorney over Robert but refused to complete the sale. In May 2019, Ellarine sent plaintiffs a refund of the $10,000 deposit, but plaintiffs did not cash that check. Plaintiffs' complaint against Ellarine alleged: (1) breach of contract, (2) fraudulent misrepresentation, and (3) violations of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2018)).

3

¶ 10   On August 15, 2019, Ellarine answered the complaint denying or stating she had insufficient information to admit or deny the majority of the allegations in plaintiffs' complaint. She also filed a countercomplaint alleging plaintiffs "strong-armed" her into signing the sales contract, the sale was never completed, and never included Robert, who jointly owned the land. The countercomplaint further claimed damages from plaintiffs' removal of the fence. On September 5, 2019, plaintiffs filed an answer to Ellarine's countercomplaint denying or alleging insufficient information to the majority of allegations that formed the countercomplaint's basis.

¶ 11   On February 14, 2021, Robert Santel passed away. On March 2, 2021, plaintiffs filed motions for summary judgment on their own complaint, as well as Ellarine's counterclaim, and attached copies of deposition testimony taken in discovery, to support the motions. On April 8, 2021, the trial court denied both motions, finding the validity of the sales contract was a disputed question of fact.

¶ 12   The case proceeded to trial on May 24, 2021, and June 18, 2021. On May 24, 2021, testimony was provided by William Jansen, Lavern Jansen, Matt Jansen, and Chris Santel. William Jansen testified that he was a dairy and crop farmer his entire life. He worked with his son, Matt, and his brother, Lavern. William lived half a mile from Ellarine, and the families always got along as neighbors. He began leasing approximately 46 acres of tillable ground from the Santels beginning in 2008 and ending in 2019. They leased the property for $180 an acre. They also leased the Santels' pasture acreage for $200 a month for about three or four months each year depending on the weather, and the amount of grass, for the heifers. William stated the leases started out as written but eventually became yearly oral leases.

¶ 13   With regard to the sales contract, William stated that the original conversation to purchase the property was in the spring of 2018 for purchase that fall. When fall came, the purchase was

4

pushed to December 2018. He stated there was a meeting in early December with him, Lavern, Matt, William's son Bill, Ellarine, and her three children Chris, Ed, and Sonja. At that time, Ellarine stated that she wanted to keep her house and some acreage and some timber. No price was discussed at that meeting, and everybody was ok with the proposed land being offered. A week or two later, Ellarine and her family wanted to have another meeting, so the same group met again. At that meeting, Ellarine stated she did not want to keep the acreage, all she wanted was the house and the land where it was situated. The acreage at issue consisted of the pasture and the timber. The offer to purchase was $400,000, excluding the house. Ellarine suggested that price, and William believed it was fair. He stated there was never any offer or discussion of a per acre price.

¶ 14    William identified the sales contract and confirmed his signature thereto. He confirmed that was the contract signed when Ellarine stated she was also including the pasture and the timber. He further confirmed watching Ellarine sign the contract. He stated the 4612 Airport Road address was Ellarine's house and the address at 4342 Airport Road was where the old farmhouse and farm buildings were. William explained that the contract stated, "exact legal description language to follow" because they had to have the property surveyed to get a legal description of the property without Ellarine's house. Netemeyer Engineering prepared the survey, which included 2.1 acres and Ellarine's house. William stated that Ellarine told them to use Netemeyer.

¶ 15    William stated they paid the $10,000 to Ellarine the night the contract was signed, and she cashed the check the next day. He stated that Ellarine's children all reviewed the contract and raised no objections. They were all in agreement, including Ellarine. The meeting lasted about two hours. During that time, they filled out the contract. After the contract was signed, they stayed for about half an hour reminiscing.

5

¶ 16    After the Netemeyer Engineering plat was completed, the original and five copies were provided to Ellarine. When they received the documents back from Ellarine and received approval from the local departments, they realized the documents were not notarized, and Lavern returned them to Ellarine. After about a week or two, they called Ellarine to find out if she had the papers notarized. Her son Chris called later stating he had bad news and wanted to meet with them. At that meeting, Chris stated Ellarine was no longer selling the property to the Santels, she was no longer leasing the farm property to them, and she might not be able to return the down payment. When asked why Ellarine had taken this position, Chris stated they were attempting to get state aid to help pay for Robert's nursing home care which did not allow Ellarine and Robert to have any kind of income. William stated that he, Lavern, Matt, Ellarine, Chris, and Chris's son, Bryan, were all at that meeting. William testified that at no time did the Santels indicate they were not signing the contract because it was inaccurate. Nor was any issue raised regarding the price, the acreage, or the plat. He further stated that nothing about Robert's signature was mentioned either. William stated that he received a cashier's check for the amount of the down payment from Chris about three weeks later but did not cash the check because he believed the contract was good. Thereafter, William had the property appraised as part of the financing; the property, including Ellarine's house, appraised at $430,000. The property appraisal included 46.13 acres of tillable land, 9.08 acres of pasture, and 17.55 acres for the woods.

¶ 17    William testified that when they returned to get the plat papers from Ellarine, Ellarine's signatures were crossed out and void was written on the paperwork. William identified the plat. He also identified Ellarine's signature. He stated he did not witness Ellarine originally sign the papers, but his brother, Lavern, did. She signed the documents for both her and Robert's names in two places on the original document as well as the five copies. William testified that Ellarine

6

advised them on the night the contract was signed that she had power of attorney over Robert, and she did not need to have him sign anything. William stated he had no reason to believe otherwise, because Ellarine had signed Robert's name in the past on government farmland papers and checks they had written to lease the farmland. He stated that Robert was residing in a nursing home and had Alzheimer's disease.

¶ 18    Lavern Jansen's testimony was nearly identical to that of William. He clarified that there were written farm leases up to 2013, and thereafter, the leases were verbal agreements. He further clarified that at the first meeting, Ellarine wanted to keep her house, about six acres of tillable ground, and the timber to the east of her house. At the second meeting, she just wanted to keep her house, the barn behind it, and the garage. Ellarine's portion ended up being 2.1 acres. Lavern stated they originally offered $375,000 for the property, but Ellarine proposed $400,000.

¶ 19    Lavern stated that Ellarine was home when the survey was performed. He was there with the surveyor. He stated that pins were left following the survey that were visibly marked and easy to see from Ellarine's house. Lavern also testified that he witnessed Ellarine signing her name, as well as Robert's name, to the plat. Chris was also present when Ellarine signed the plat. Lavern stated that Ellarine voluntarily signed her name, as well as Robert's, to each of the five documents. He testified that neither Ellarine nor Chris ever raised any objection or disagreement with what was contained in the plat. Lavern further testified that on the night the original contract was signed, Ellarine requested the payment in two checks, one to her and one to Robert, because she wanted to use Robert's money to pay his nursing home bills. In response, Lavern informed Ellarine there could only be one check because it was being issued by the bank.

¶ 20    Matt Jansen's testimony was similar to that provided by William and Lavern but also addressed the financial losses stemming from the inability to farm the land in 2020 and 2021 by

7

discussing the costs associated with farming under the lease and the crop yield. Thereafter, plaintiffs rested.

¶ 21 The defense called Chris Santel. He disputed two family meetings occurred regarding the initial contract, stating there was only one. He further stated the abandoned farmhouse was uninhabitable, and he and Ellarine agreed the property needed to be demolished. He was the only child that helped with the farm; his brother, Ed, and his sister, Sonja, did not work or have anything to do with the farm. He stated his father, Robert, was diagnosed with Alzheimer's in 2013 and was placed in a nursing home after Ellarine could no longer provide care at home.

¶ 22 Chris disputed calling plaintiffs to schedule any meeting about the sale, stating Ellarine called them. He agreed with prior testimony stating who was present on the day the contract was signed and where it was signed. However, he stated that he, Ed, and Sonja were in the living room when it was signed. He stated they agreed to sell the property for $8000 per acre. Ellarine then went to the bathroom and on her way back through the kitchen, plaintiffs had Ellarine sign the contract. None of the children were in the kitchen when the contract was signed. The plaintiffs left 15 or 20 minutes later. When Chris was locking the door later that night, he reviewed the contract and immediately told his mother the contract was incorrect because it was not priced for 76 acres at $8000 per acre. Chris stated that they talked it over with Ellarine's brother who was a retired land appraiser and he informed them that the document was not really a legal document because it did not have anything but the addresses for the properties. Ellarine's brother told them to talk to an attorney.

¶ 23 Chris testified that they went to the lawyer, who also stated the contract was not binding. They decided to wait until the legal description was prepared so they would know exactly what

plaintiffs were wanting to buy. He stated that at no point did they ever discuss a flat figure for the sale, it was always a price per acre deal.

¶ 24    Chris also disputed calling plaintiffs to tell them there would be no sale. He stated plaintiffs called them several times and wanted to know what was happening and the Santels informed plaintiffs they were thinking about getting help for Robert in the nursing home because it was very expensive. Chris stated their lawyers informed them that they could get at least $600,000 to $800,000 for the land.

¶ 25    Chris stated Ellarine obtained power of attorney over Robert in either March or April 2019. He believed it was after Ellarine told the plaintiffs she was not going through with the sale. He disputed ever telling plaintiffs he or Ellarine had power of attorney prior to that.

¶ 26    On cross-examination, Chris stated that he was not in the room when Ellarine signed the contract and disputed there being a ramp in the Santel home. He further disputed the contract was ever reviewed by anyone in the Santel home prior to Ellarine signing the contract. He stated no one looked at the contract before plaintiffs left that night. After he reviewed the contract, Chris stated he immediately knew the contract was incorrect. He further stated they did not advise plaintiffs of the error until March because they were seeking help from an attorney. Chris said he did not know why they did not simply call the plaintiffs to tell them the Santels did not think the contract was accurate. He could not recall when they sought legal assistance.

¶ 27    Chris identified the plat and stated he was present when Ellarine signed her name, as well as Robert's name, on that document. He "guessed" that she voluntarily signed it. He stated they never had the land appraised but disputed the appraisal value provided by the bank. He agreed that they told plaintiffs they were not going to sell the land after Ellarine signed the contract and the

9

plat. He testified that at that time, they were trying to get financial assistance for Robert's care from the state and the state would pay for the care but would put a lien on the property.

¶ 28 Chris agreed that plaintiffs removed the fence prior to being advised that the sale was not going through. He stated Ellarine did not give them permission to take the fence down. She thought they were just going to clean up the property. He could not remember if they told plaintiffs they could not take down the fence when they saw it occurring. Chris was not sure if he went over before or after they canceled the contract, but at some point he told them to stay off the property and to not destroy anything else.

¶ 29 Chris also disputed telling plaintiffs they would not return the deposit. He stated it took some time to come up with the money to pay them back. He stated Ellarine cashed the deposit check the day after signing the contract and used the money to pay for Robert's nursing home care.

¶ 30 As to the plaintiffs' lease of the property, Chris's testimony indicated that plaintiffs underpaid his mother. He stated that a certified letter was sent terminating the lease, but he did not know if it was sent prior to or after the cancelation of the contract. He further confirmed that he called the police on plaintiffs for being on the property even though the court had issued an order allowing them to farm the land that year. He did not know if the responding officers required plaintiffs leave the property after he called. He agreed they did not remove the no trespassing signs as required by the order. Chris stated that he was aware the property was subject to the present litigation when they burned the farmhouse to the ground, but he did not think it mattered. Following Chris's testimony, the court ended the hearing for the day.

¶ 31 The bench trial resumed on June 18, 2021. Ellarine was called to testify and stated there were discussions before the signing of the contract that stated she would sell the tillable ground for $8000 an acre, as well as the timber ground and pasture ground, because other neighbors were

selling their farmland for between $7000 and $8000 an acre. Ellarine agreed the contract did not contain a legal description or the amount of acreage. She agreed the total price was $400,000. She thought she was selling the whole property, the house and everything, all the buildings, the timber ground, the pasture, and the tillable acres. She thought that was $8000 an acre but agreed that did not add up to $400,000.

¶ 32     Ellarine stated that after plaintiffs left following the contract signing, she showed the contract to Chris and the next day they figured out plaintiffs were only paying $5000 an acre instead of the $8000 they agreed on. After that, they took the papers to a lawyer, and he said the document was not legal because Ellarine did not have power of attorney over her husband so she could not sign his name. The lawyer told her to go home, get a magic marker, cross out all the signatures, and write on the document that it was not valid. She did so. That lawyer sent her to another lawyer who also stated the contract was not legal. Ellarine did not remember the dates of the appointments. Ellarine stated she did not know how many acres were depicted on the plat.

¶ 33     Ellarine also disputed two meetings with plaintiffs prior to the contract signing but agreed with who was present on the day of the signing. She confirmed Chris's testimony about signing the document in the kitchen in the presence of William and Lavern. She stated that when plaintiffs came to pick up the plat papers and she told them she scratched off the signatures, plaintiffs became angry and threatened her.

¶ 34     Ellarine was unsure of the date when she scratched out the names and did not know exactly how many tillable acres she had. As to the farm leases, Ellarine stated they were always based on a per acre basis and Robert did the initial dealings with the leases. She did not know if the contract depicted anything about mineral rights. She also stated she did not know what "legal description to follow" in the original contract meant.

11

¶ 35    On cross-examination, Ellarine stated she did not believe, after she signed the initial contract, that it was a legally binding document, because she did not have authority to sign it for Robert. She stated she did not get power of attorney until 2019. Ellarine admitted she had signed Robert's name to documents prior to obtaining the power of attorney. She signed his checks, and her children were aware that she always signed her husband's checks. Ellarine also confirmed she blacked out the signatures she previously provided for the plat in both her and Robert's names.

¶ 36    She stated that when she initially said she would sell the property she considered plaintiffs to be friendly and neighborly and had no problem with them farming the land. She confirmed that after Robert entered the nursing home, plaintiffs continued to farm the land and she cashed checks the plaintiffs provided for said purpose. Ellarine also confirmed that she did not make any attempt to remove plaintiffs from farming the land until after the contract dispute started.

¶ 37    Ellarine testified that neither William, nor Lavern, threatened or intimidated her, in any way, when she signed the original contract. She stated she did not feel any pressure to sign the contract. She stated that none of her three children who were present in the house reviewed the contract prior to her signing the contract. It was not until the plaintiffs left that Ellarine showed the contract to Chris and they realized the contract was wrong. Ellarine agreed that she made no effort to tell plaintiffs the contract was wrong for 3½ months. She stated that she decided not to follow through on the contract because it would affect qualification for Medicaid. Ellarine conceded that numerous statements in her response to interrogatories were not the same reasons for the dispute provided during the litigation, including a lack of Robert's signature, the acreage involved, and the price per acre. Ellarine confirmed that Robert died, and she now was the sole owner of the property. Ellarine stated that she did not know why she waited three months before she pointed

12

out any problem with the contract to plaintiffs. She confirmed that she cashed the deposit check the day after the contract was signed.

¶ 38　Following all the testimony, the trial court directed the parties to provide written closing argument and stated the following with regard thereto:

"[T]he primary question I would ask and that would need to be addressed in any argument is I have what's reported to be a contract that bears the signature of all parties. We have the testimony of the defendant that she signed it that evening in the kitchen. Her family was present in the next room. *** She wanted $8,000 an acre. She knew exactly how many acres she wanted to sell because her testimony was she wanted to sell everything, but the house, and she said she wanted $8,000 an acre. But that doesn't explain why she accepted the $400,000 purchase price. ***

I mean, anybody can multiply 72 or 64 acres by 8,000 and realize 400,000 isn't even close. So why put the signature on the contract? And why sign the contract without talking to your family who is sitting just feet away who you brought to the premises to assist you?

***

Also, from the legal standpoint, of course, there's *** several issues raised. What— primarily, was there in fact ever a meeting of the minds? What was the meeting of the minds? Can there be a meeting of the minds without a legal description on the—on the contract? There *** [were] other issues that were not discussed: Time of closing, method of payment, cash[,] or credit. There were several issues out there that were not addressed by the contract. So[,] another legal issue would be[,] do we in fact have a contract? So

13

those are the types of questions I would be asking during a closing argument. I would

appreciate it if you [would] address them in your written argument."

¶ 39    Ellarine's written closing argument was filed on September 17, 2021. Plaintiffs' reply was

filed on September 28, 2021. On November 22, 2021, the trial court issued its order and found that

Ellarine and her son Chris's testimony regarding whether the contract was reviewed prior to

signing, was not credible. The court further found Chris's testimony, that he knew something was

wrong with the contract the same day Ellarine signed it, was equally not credible based on the

actions taken by both parties which included: Ellarine's cashing of the deposit check, Ellarine

allowing plaintiffs on the property to remove fencing, Ellarine allowing the engineer on the

property to conduct the survey and signing the surveyor's prepared plat once it was completed.

¶ 40    The court found that the initial purchase agreement was insufficient to form a valid contact

because it did not contain a legal description, but after the surveyor completed the plat, and Ellarine

signed the plat, a valid, enforceable contract existed. The court found Ellarine breached the

contract when she declared the contract void and refused to complete the transaction. With regard

to whether Ellarine had authority to sign on behalf of Robert, the court found this was not an issue

that needed to be addressed because Ellarine always had the authority to sell her own interest, and

upon Robert's death, obtained his interest as well. The court granted plaintiffs' request for specific

performance requiring Ellarine to sell them the property and awarded damages in the amount of

$55,767.82 based on plaintiffs' inability to farm the land for two years. The court denied plaintiffs'

request for costs related to plat preparation, removal of the abandoned building, and damages under

the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq*. (West 2018)).

Ellarine's counterclaim was also denied after the court found the purchase agreement was valid,

14

binding, and enforceable. A written judgment incorporating the court's order was filed on December 10, 2021. Ellarine timely appealed.

¶ 41                                II. ANALYSIS

¶ 42     On appeal, Ellarine argues that the trial court erred by finding the sales agreement was a valid, enforceable contract. She also argues that even if the trial court's finding regarding the sales agreement was correct, that the court's interpretation of the contract was erroneous. Plaintiffs urge affirmation of the trial court's order and judgment.

¶ 43     A trial court's decision following a bench trial is reviewed to determine if the judgment is against the manifest weight of the evidence. *Smith, Allen, Mendenhall, Emons & Selby v. Thomson Corp.*, 371 Ill. App. 3d 556, 558 (2006). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). That standard affords great deference to the trial court because we recognize "that, especially where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to the court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof." *Schulenburg v. Signatrol, Inc.*, 37 Ill. 2d 352, 356 (1967). "We may not overturn a judgment merely because we might disagree with it or might, had we been the trier of facts, have come to a different conclusion." *Id.*

¶ 44     Typically, the legal effect of a contract is reviewed *de novo. Eychaner*, 202 Ill. 2d at 252. However, "the factual findings that inform this interpretation are given deference on review and are to be reversed only where they are against the manifest weight of the evidence." *Wiczer v. Wojciak*, 2015 IL App (1st) 123753, ¶ 33.

Validity of the Contract

¶ 46    The Restatement (Second) of Contracts defines a contract as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Restatement (Second) of Contracts § 1 (1981). In Illinois, the elements of contract consist of (1) an offer, (2) acceptance of the offer, and (3) consideration. *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 151 (2006); *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 329 (1977). The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract. *Thompson v. Gordon*, 241 Ill. 2d 428, 440 (2011); *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). To determine the intent of the parties, the court looks to the instrument itself, its purpose, and the surrounding circumstances of its execution and performance. *Gallagher*, 226 Ill. 2d at 233.

¶ 47    Here, the intent of the parties is seen by the language of the agreement: Ellarine intended to sell real property to William and Lavern for $400,000. The sales contract provided the addresses of the properties at issue but excluded "Ellarine's house." The trial court also found intent was shown by the actions taken following the execution of the December 19, 2018, contract. The trial court found these actions, which included Ellarine (1) depositing the deposit check, (2) allowing plaintiffs to remove debris and take down a fence, and (3) allowing the engineer to survey the property, expressive of Ellarine's intent to sell real property to plaintiffs. These actions are also indicative of plaintiffs' desire to purchase the property. Ellarine signing her own name and Robert's name to the plat also clearly establishes the intent of the purchase agreement. While both Ellarine and Chris provided testimony undermining the intent, the trial court specifically found that testimony was not credible. As credibility is the function of the trial court, we defer to those

credibility findings. *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 548 (2007).

¶ 48    The general rule in Illinois "is that a contract for the sale of real estate cannot be specifically enforced by a court unless the writing evidencing the agreement contains the names of the seller and purchaser, a description of the property sufficiently certain so that it can be identified, the price of the property, the terms and conditions of sale and the signature of the party to be charged." *Werling v. Grosse*, 76 Ill. App. 3d 834, 841 (1979) (citing *Cefalu v. Breznik*, 15 Ill. 2d 168, 170 (1958); *McDaniel v. Silvernail*, 37 Ill. App. 3d 884, 886 (1976)); see also *Callaghan v. Miller*, 17 Ill. 2d 595, 599 (1959). Illinois also requires the sale of real property be reduced to a writing. 740 ILCS 80/2 (West 2018).

¶ 49    Upon review of the document, the sales contract contains the names of the seller and purchasers as well as the signatures thereof. The document also contains the addresses for the subject property along with the exclusion for Ellarine's house, the purchase price of $400,000 as well as the terms and conditions of the sale, which included a deposit of $10,000 with the balance of $390,000 "due at closing cash or certified funds."

¶ 50    While the sales contract stated an "exact legal description [was] to follow," "an instrument will not be rendered ineffective for uncertainty of the premises to which it relates if by the aid of extrinsic evidence it can be made certain and the property located." *Werling*, 76 Ill. App. 3d at 841. We note, in *Werling*, the description of "my farm" was found to sufficiently identify the property at issue. *Id*.

¶ 51    Here, a plat identifying the parcels at issue, carving out a portion for Ellarine's house, and providing the legal description followed and was more than sufficient to identify the property. Illinois has long held that where different instruments are executed by the same parties and in the

17

course of the same transaction, the instruments are to be read and construed together. *Sandra Frocks, Inc. v. Ziff*, 397 Ill. 497, 504 (1947). We find the plat, prepared at the request of plaintiffs, and executed by Ellarine, is part of the original contract. It provides the specificity anticipated and required by the initial contract and shows the intent of Ellarine to sell the real property, as described in both the sales contract and plat, to plaintiffs.

¶ 52     On appeal, Ellarine does not argue that it was error to consider the plat in conjunction with the purchase agreement. Nor does she argue that she did not sign the plat. Instead, she argues that she and plaintiffs never had an agreement as to the "exact legal description to follow" because Ellarine never provided a "recordable" plat containing the legal description because she failed to notarize the plat as required by section 1.005 of the Plat Act (765 ILCS 205/1.005 (West 2018)). She further argues that the original contract terms were incomplete because the purchase agreement failed to include a closing date, financing terms, tax proration, or closing costs, which were "imperative terms to indicate to the parties what obligations they [had] to the contract." We find that neither argument has merit.

¶ 53     The Plat Act (765 ILCS 205/0.01 *et seq.* (West 2018)) requires the owner of property that will be subdivided "into 2 or more parts, any of which is less than 5 acres," to have the property surveyed and a subdivision plat made by an Illinois Registered Land Surveyor. *Id.* § 1(a). However, the Act also contains 10 exceptions stating who need not comply with the plat requirement. *Id.* § 1(b). Owners who are required to file a plat under section 1(a) must also "submit simultaneously with the subdivision plat a notarized statement indicating *** the school district in which each tract, parcel, lot, or block lies." *Id.* § 1.005(a).

¶ 54     While Ellarine cites the Plat Act, she provides no argument or evidence that the property sale required her compliance with section 1(a) of the Plat Act or that none of the 10 exceptions in

18

section 1(b) of the Plat Act applied to this sale. Even if the Plat Act applied, nothing in section 1.005 undermines the "recordability" of the plat as claimed by Ellarine. In fact, section 1(c) specifically controverts such contention as the recorder has no responsibility to determine whether the plat is filed as required under section (a), or as an excepted property plat under section (b), prior to recording the plat. *Id.* § 1(c). Liability for an erroneous plat filing is limited to circumstances involving subsequent purchasers not the "recordability" of the plat. *Id.* § 1.005. As such, Ellarine's claim that she did not provide a "recordable" plat by only signing the document, and not notarizing the document, is without merit.

¶ 55    Ellarine also argues that the terms of the sales contract were incomplete because the original sales agreement failed to include: "a closing date, financing terms, tax proration, or closing costs," which were "imperative terms to indicate to the parties what obligations they have to the contract." We note, this issue was also important to the trial court. In fact, in allowing the parties to provide written closing argument, the court specifically stated, "There *** [were] other issues that were not discussed: Time of closing, method of payment, cash or credit. *** I would appreciate it if you [would] address them in the written argument." Despite the court's request, no such argument related to any of the allegedly "imperative terms" was provided by Ellarine to the trial court, and therefore, is inappropriate here. Issues not raised in the trial court are deemed forfeited and may not be raised for the first time on appeal. *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 121 (2004).

¶ 56    We note, however, that waiver is merely a limitation on the parties, not this court, and an appellate court may disregard the waiver based on its obligation to achieve a just result and maintain a uniform body of precedent. *Country Mutual Insurance Co. v. Hagan*, 298 Ill. App. 3d

495, 507 (1998). In this case, we recognize the importance of property rights and therefore choose to address this issue in the interest of justice.

¶ 57       First, we do not find the lack of a closing date dispositive. "[A] contract to convey real estate is not unenforceable merely because it does not specify the time in which performance should take place ***." *Werling*, 76 Ill. App. 3d at 842. As noted in *Werling*, "where time is not made the essence of the contract the law will imply that the contract be performed within a reasonable time." *Id.* (citing *Ullsperger v. Meyer*, 217 Ill. 262, 276 (1905)). Here, there is no indication that time is of the essence in this contract.

¶ 58       Second, we note that financing was not at issue, as the sales contract specifically required William and Lavern to pay the "[b]alance due at closing in cash or certified funds." The lack of information related to taxes and closing costs is equally irrelevant. "The omission of terms regarding the proration of taxes, specifications as to closing costs and other closing matters, *** are nonessential matters which may be implied from the circumstances or from custom." *White Hen Pantry, Inc. v. Cha*, 214 Ill. App. 3d 627, 634-35 (1991). As such, we find Ellarine's arguments uncompelling. For these reasons, we hold that the trial court's findings underlying the judgment were not against the manifest weight of the evidence and affirm the trial court's finding of a valid, enforceable contract.

¶ 59                                   Ellarine's Property Interest

¶ 60       Ellarine also argues that she only had authority to sell her own one-half interest in the property and, therefore, the award of specific performance should be limited solely to her interest. In response, plaintiffs contend the after-acquired doctrine governs disposition of this issue.

¶ 61       The after-acquired doctrine states that full ownership is not required at the time the contract is signed and is only required at closing. See *Crum v. Krol*, 99 Ill. App. 3d 651, 656 (1981) (citing

*White v. Bates*, 234 Ill. 276 (1908); *Bissett v. Gooch*, 87 Ill. App. 3d 1132 (1980)). The doctrine is also codified in section 7 of the Conveyances Act, which states:

> "If any person shall sell and convey to another, by deed or conveyance, purporting to convey an estate in fee simple absolute, in any tract of land or real estate, lying and being in this state, not then being possessed of the legal estate or interest therein at the time of the sale and conveyance, but after such sale and conveyance the vendor shall become possessed of and confirmed in the legal estate to the land or real estate so sold and conveyed, it shall be taken and held to be in trust and for the use of the grantee or vendee; and the conveyance aforesaid shall be held and taken, and shall be as valid as if the grantor or vendor had the legal estate or interest, at the time of said sale or conveyance." 765 ILCS 5/7 (West 2018).

¶ 62    While Ellarine's argument, that she only possessed a one-half interest in the property, was initially raised in her counterclaim, the argument was discarded by the close of the trial. Further, Ellarine's current argument is contrary to her closing argument, which stated:

> "In the event the Honorable Court were to find that a valid contract existed, the After Acquired Property Doctrine would cure any claims by Ellarine Santel that she had power of attorney for Robert Santel, because Ellarine could deliver the real estate to the Plaintiffs since she now has full title to the real estate in question, and even if Robert Santel were still with us, Ellarine Santel could have gotten guardianship over Robert Santel, if necessary to close on the sale prior to closing since no closing date was set in the 'Sales Contract for Purchase & Sale of Real Estate' dated December 19, 2018."

¶ 63    As Ellarine conceded the effect of the after-acquired doctrine in her closing argument, to now argue it does not apply for any reason, is not well-taken. Further, we find that Ellarine's

argument, first raised in her reply brief and reiterated during oral argument, claiming that the contract did not transfer the property in fee simple, is forfeited pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). Ellarine's appellate argument is also precluded by the invited error doctrine which prohibits a party from requesting the trial court proceed in a certain manner and then arguing on appeal that such requested action was error. *Direct Auto Insurance Co. v. Bahena*, 2019 IL App (1st) 172918, ¶ 36. As no sustainable argument was presented, we affirm the trial court's award of specific performance awarding Ellarine and Robert's full interest in the subject property to plaintiffs.

¶ 64                              III. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the trial court's order and judgment in favor of plaintiffs.

¶ 66    Affirmed.